653 So.2d 526 (1995)
STATE of Louisiana
v.
George Delano MAXIE
No. 93-KA-2158.
Supreme Court of Louisiana.
April 10, 1995.
Rehearing Denied May 22, 1995.
*527 R. Neal Walker, Carol A. Kolinchak, for applicant.
Richard P. Ieyoub, Atty. Gen., Don. M. Burkett, Dist. Atty., Charles B. Adams, for respondent.
*528 VICTORY, Justice.[1]
A jury convicted the defendant, George Delano Maxie, of one count of first degree murder and sentenced him to death for the May 21, 1992 strangulation and aggravated rape of Paula Manning. This is a direct appeal from that conviction and sentence. La. Const. art. V, § 5(D)(2). The defendant raises numerous assignments of error, including the failure of the trial court to sustain his challenge for cause of venire member Gloria Rains, and the lack of sufficient evidence to sustain the conviction. We find the latter assignment without merit. However, because we find reversible error in the trial court's failure to excuse prospective juror Rains for cause, we reverse and vacate the conviction and death sentence, and remand for a new trial.[2]

FACTS
In May 1992, Paula Manning rented a mobile home fronting Highway 171 in Florien, Louisiana. After making repairs to the home's interior and cleaning the yard, she moved in and spent her first night in her new home on May 18, 1992.
On May 21, 1992, the defendant, and three long-time friends, Marcus Garner, Robert Earl Collier, Jr., and Keith Dewayne Collier[3], spent the afternoon together. With Marcus driving his aunt's car, the four men travelled from Florien to nearby Many, where they washed the car. They then proceeded to neighboring Zwolle, where they purchased three or four bottles of wine. Between 6:00 and 6:30 p.m., after spending most of the afternoon drinking and riding through Zwolle and Many, the group headed back from Many to Florien by way of Highway 171.
As they passed Paula Manning's mobile home the defendant noticed her working in the yard and asked Marcus to stop the car. Marcus refused, and continued down Highway 171 to the "Busy Bee," a nearby convenience store, where Robert got out to buy something to eat. The defendant then announced that he was going to "rape that white bitch." He exited the car and began walking down Highway 171, in the direction of Paula Manning's mobile home.
When Robert returned, Marcus and Keith informed him of the defendant's intentions. The three men then backtracked down Highway 171, and found the defendant as he was approaching a carwash near Paula Manning's mobile home. They encouraged the defendant to get into the car, but he refused, remarking that he knew what he was doing. Following their unsuccessful attempt to prevent the defendant from carrying out his plan, Marcus, Keith and Robert drove home to Florien. When they left, the defendant had turned off of Highway 171, and was walking down a dirt road separating the carwash from the lot upon which Paula Manning's mobile home was located.
At about 8:00 a.m. the next morning, Paula Manning's partially nude body was discovered by local police officers in dense woods 30 yards behind the mobile home. She had been severely beaten and raped. Following an investigation, the defendant was indicted for first degree murder.

TESTIMONY AND OTHER EVIDENCE
At the trial, Marcus Garner, Robert Collier and Keith Collier testified to many of the facts stated above. Marcus also testified that after leaving the defendant on Highway 171, he did not see him again until May 24, 1992, as he was riding through Florien. The defendant got into the car with him, and told Marcus that he had raped the victim and killed her. He also told Marcus that the victim struggled, and had to be "snatched" from a fence which she was grasping. Marcus testified that the defendant threatened to kill him if he told anyone.
Robert Collier testified that after the group left the defendant on Highway 171, Marcus dropped him and Keith off at their *529 home. As he was leaving home approximately one hour later, Robert noticed the defendant walking towards his house from the direction of a set of railroad tracks that run directly behind the victim's mobile home. He recalled that the defendant looked "sweaty." Robert testified that the defendant told him that he had "raped the girl and killed her," and that he had stolen money from her. The defendant asked him for a change of clothes, which Robert retrieved from inside the house. Thereafter, the defendant, and both Collier brothers rode with Chris Holden to Many. Robert recalled that he and Chris rode in the front seat, while the defendant and Keith rode in the backseat. According to Robert, the defendant changed clothes in the backseat of the car.
Keith Collier testified that after the group left the defendant on Highway 171, Marcus dropped him and Robert off at their home between 6:00 and 6:30 p.m. Keith recalled that he was watching television when Robert came into the house to get the defendant a change of clothes. While Robert was getting the clothes, Keith went outside and talked to the defendant, who told him that he had vaginal and anal intercourse with the victim, and that he "choked" her while he was having sex with her. Keith also testified that the defendant told him that he "came from the back of the house and she was in the front by the fence and he said she turned around and seen him and she asked him what he wanted and he grabbed her and she grabbed hold to the fence and he pulled her from the fence and dragged her to the back."
Keith stated that he, Robert and the defendant rode to Many with Chris Holden. Keith recalled riding in the backseat with the defendant, where he changed into the clothes that Robert had given him. According to Keith, the clothes that the defendant was wearing before he changed were "kind of wet." Upon returning from Many, Chris Holden dropped the defendant and the Collier brothers off near the railroad tracks close to their home. Keith recalled walking to a nearby picnic table where the defendant gave him a watch which the defendant said he had taken from the victim. At that time, the defendant also informed Keith that he had gone into the mobile home and taken money out of the victim's purse.
Mia Skinner, a friend of the victim, also testified on behalf of the state. Earlier that day, she and the victim had agreed to meet at the mobile home at 7:00 p.m. to frost Mrs. Skinner's hair. Mrs. Skinner testified that she arrived on time. However, the victim was not home and Mrs. Skinner let herself into the unlocked residence. Upon entering, she noticed the victim's purse and keys on a chair near the door. After waiting for about 30 to 40 minutes for the victim to return, she left to check on her children.
Mrs. Skinner returned to the mobile home approximately 20 minutes later. Upon her arrival she observed that the front fence gate was open, even though she recalled closing it to keep the dog inside of the yard. She entered the residence, and noticed that the victim's purse had been moved from the chair to a recliner. She also noticed a "dirty" pair of black and green "Newport" sunglasses lying on the right side of the purse. Mrs. Skinner waited another 35 to 40 minutes, and then left to find Kenneth Eugene Behan, the Florien Police Officer on duty that night, to inquire whether he had seen the victim.
After locating him, Mrs. Skinner and Officer Behan proceeded back to the mobile home, searched the premises, inside and out, and discovered nothing unusual. Upon his departure, Mrs. Skinner remained for an additional 15 minutes, and then decided to return home. Shortly thereafter, Mrs. Skinner revisited the mobile home a third time, and waited in her car until about 10:00 p.m. When the victim did not appear, she left for the evening.
Officer Behan testified that he was patrolling Highway 171 at about 6:15 p.m., and he saw the victim working in her front yard. He confirmed Mrs. Skinner's testimony that they searched the premises at about 9:00 p.m., and found nothing. He returned to the victim's mobile home at 10:00 p.m. to search the premises again, but did not find anything unusual.
Duane Calhoun, the Chief of the Florien Police Department, testified that he received *530 a telephone call from Mrs. Skinner at about 7:30 a.m., on May 22, 1992. She asked whether the victim had reported to work that day.[4] Chief Calhoun stated that she had not, whereupon Mrs. Skinner informed him of the events from the preceding evening. At about 8:00 a.m., Chief Calhoun and Deputies Ben DuBose and Dennis Weldon went to the victim's residence to investigate.
Chief Calhoun searched the trailer and the surrounding property. As he was inspecting the backyard he noticed what appeared to be a body lying in dense woods about 30 yards behind the mobile home. Upon closer examination he found that it was the victim's body. Local law enforcement then turned over the investigation to Sabine Parish authorities for the collection of physical evidence.
Teddy G. DeLarcerda, an investigator for the Sabine Parish District Attorney's Office, testified that he found evidence of a struggle in the yard near a gate and along the fence. Several flower pots had been broken, and a white five gallon bucket near the gate had been turned on its side, allowing accumulated water and garbage to spill over. Also, dirt areas near the bucket showed signs of being "scuffed" or "kicked". Additionally, top portions of the chain link fence running near the "scuffed" or "kicked" areas were bent outward away from the yard.
Investigator DeLarcerda also inspected the inside of the mobile home. He found the victim's purse in the recliner, and found a pair of black and green "Newport" sunglasses lying near the purse. At trial, Keith Collier identified these sunglasses as being the same type worn by the defendant.
Detective James McComic of the Sabine Parish Sheriff's Department assisted with the investigation. He agreed with Investigator DeLarcerda's conclusion that there was evidence of a struggle inside of the yard near the gate and along the fence. He also observed signs of a struggle outside of the fence, stating that the 10 to 12 inch grass outside of the yard was "mashed down" as if something or someone had been dragged away from the mobile home into the woods. When questioned by police officers prior to the defendant's arrest, Keith informed them about the wrist watch that the defendant had given to him on the evening of the murder. At trial, the watch was identified by both Keith and the victim's mother, who testified that she had given the watch to her daughter about a week and a half before her death.
Rebecca Collins, an expert in serology with the North Louisiana Criminalistic Laboratory, examined vaginal washings and swabs taken from the victim. She testified that spermatozoa was present in these samples. She also testified that samples taken from the victim's right breast indicated that human saliva was present. However, she was unable to perform any typing or grouping tests on either the spermatozoa or the saliva samples because they were not concentrated enough. Ms. Collins also examined scrapings taken from the sunglasses that were found inside of the victim's home. She determined that they were covered with human blood, but the scrapings were unsuitable for blood typing because the glasses had been previously fumed and dusted for fingerprinting purposes.
Garry Bass, a Caddo Parish Sheriff's Deputy and fingerprint analyst for the North Louisiana Criminalistic Laboratory, was qualified as an expert in fingerprint identification. He removed a partial latent palm print from the sunglasses that positively matched comparison prints taken from the defendant.
Dr. J. Parker Mashburn, deputy coroner for Caddo and Bossier Parishes, autopsied the victim's body. He determined that the cause of death was manual strangulation by use of hands. He testified that the victim had been seriously beaten prior to death. His examination revealed injuries over her entire face and neck, with severe swelling and contusions mainly on the right side of her upper lip, cheek, jaw and neck. She had bruises between her chin and collar bone which were consistent with manual strangulation. She also had bruises and contusions on the inside of her right thigh and knee, and the lower portion of her left leg. Dr. Mashburn also found a bloody or muddy palm *531 print on the inner right thigh. In his opinion, these leg injuries and the palm print were consistent with having one's legs pried apart for forced intercourse. Vaginal and rectal samplings taken by Dr. Mashburn each revealed the presence of spermatozoa, indicating intercourse within 8 to 12 hours of death.
After the state rested, defense witness Chris Holden testified that when he picked up the defendant and the Collier brothers on the evening of May 21, 1992, he noticed that the defendant was buttoning his shirt as he was walking to the car. However, he did not recall the defendant changing clothes in the backseat of the car.
George Maxie, Sr., the defendant's father, testified that he visited his son in jail on May 26, 1992, and examined his body for scratches or bruises, but found none. Mr. Maxie's visit to the jail was confirmed by James A. Brumley, Jr., the Sabine Parish Sheriff's Deputy who escorted Mr. Maxie through the jail. Deputy Brumley testified that he remained in the jail quarters during the visit, and did not specifically remember seeing unusual scratches or bruises on the defendant's body.
The defendant also called Sergeant Mark Rogers, of the Shreveport Police Department, an expert in fingerprint identification for the Forensic Unit Identification Section. He did not examine the sunglasses, but analyzed the latent palm print obtained therefrom, and confirmed Mr. Bass' conclusion that it positively matched the defendant's. Sergeant Rogers testified that the print could have been made either by placing a bloody palm on the sunglasses or by placing a clean hand on the sunglasses which may have already had blood on them, but he was unable to determine which had occurred in this case.
On rebuttal, the state qualified Ray Herd, director of the North Louisiana Crime Lab, as an expert in retrieving and preserving fingerprints and in the characteristics of blood evidence. He examined the sunglasses and determined that there was a bloody transfer print on the outer lens. According to Herd, the print was left by someone who touched the lens with hands that were already wet with blood.
After the completion of the evidence in the guilt phase of the trial, the jury returned a unanimous verdict of guilty as charged.

SUFFICIENCY OF THE EVIDENCE (ASSIGNMENT OF ERROR XXIV
Although we conclude that the defendant's conviction and sentence must be reversed on other grounds and the case remanded for a new trial (see discussion of Cause Challenge, Assignment of Error I, infra), we address this assignment of error first because lack of sufficient evidence to sustain the conviction would entitle the defendant to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
The defendant was indicted with first degree murder for the killing of Paula Manning while engaged in the perpetration of aggravated rape. The relevant portions of La.R.S. 14:30 define first degree murder as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated rape....
Louisiana R.S. 14:42 provides, in pertinent part, that:
A. Aggravated rape is a rape committed upon a person ... where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.[5]
*532 In order to affirm a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational fact finder to conclude that every element of the crime was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Martin, 93-0285 (La. 10/17/94); 645 So.2d 190; State v. Captville, 448 So.2d 676 (La. 1984).
The defendant challenges the sufficiency of the evidence, contending that the state failed to prove all of the elements of the crime beyond a reasonable doubt.[6] In particular, the defendant claims that there was insufficient proof that he acted with specific intent to kill or to inflict great bodily harm. He also argues that the state failed to satisfy the elements of aggravated rape, namely, that the victim resisted to the utmost and that this resistance was overcome by force. In a related argument, the defendant also claims that the conviction is defective because the state failed to prove that the victim was alive at the time of intercourse.[7]

Specific Intent to Kill or Inflict Great Bodily Harm
Specific criminal intent is defined as "... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126, 1127 (La. 1982) (citations omitted).
Marcus Garner and Keith Collier testified that when the defendant exited the car at the "Busy Bee," he stated that he was going to rape the vicitm. The condition of going to rape the victim. The condition of the victim, as shown by the crime scene and autopsy photographs, which were attested to by Dr. Mashburn, reveals that she was not only strangled to death but was also brutally beaten over the head, face and neck.[8] Additionally, *533 the defendant's postcrime statements, that the victim had to be "snatched" from a fence, that the defendant pulled the victim from the fence and "dragged her to the back," and that he raped the victim and killed her, confirm what the photographs and autopsy evidence impart. This evidence overwhelmingly established the defendant's specific intent to kill or to inflict great bodily harm.
Resistance and Force
The victim's utmost resistance was also clearly established. It is logical to infer from the evidence that the defendant beat the victim to subdue her resistance efforts. The bruises on her inner right thigh and knee and the lower portion of her left leg, as well as the bloody or muddy palm print found on her inner right thigh, all indicate that the victim's legs were forced apart for intercourse. Additionally, Marcus Garner testified that the defendant told him that the victim struggled and had to be "snatched" from a fence to which she was clinging. Keith Collier stated that the defendant told him that he apprehended the victim in her yard, "grabbed" her from the chain link fence to which she was clinging, and dragged her into the woods. This description of the events is also in accord with physical evidence found in the yard by Investigator DeLacerda and Detective McComic. They stated that the broken flower pots, spilled bucket, and "scuff" or "kick" marks near the gate and along the fence indicated that a struggle had recently taken place. Additionally, Detective McComic found evidence that someone had been dragged outside of the yard through the grass.[9] Further, the extensive bruising on the victim's body indicates her resistance was great and force was necessary to overcome it.
As to the degree of force used to overcome this resistance, Dr. Mashburn testified that the crime scene and autopsy photographs "graphically displayed" the intensity of force that the victim endured. According to Dr. Mashburn, the victim sustained serious injuries over her entire face and neck, had severe swelling and contusions on the right side of her upper lip, cheek, jaw and neck, and bruises between her chin and collar bone from the strangulation. Further, the autopsy report reflects that the victim was 5 feet 4 inches in height, and weighed between 100 and 120 pounds. The Capital Sentence Investigation Report reveals that the defendant is 5 feet 11 inches tall, and weighs approximately 162 pounds. At the time of the crime, the defendant worked part-time in the timber industry as a wood hauler. It is reasonable to infer from this evidence that the defendant was significantly stronger than the victim, and was able to overcome her resistance. We find that there was sufficient evidence for the jury to conclude that the victim resisted to the utmost and that this resistance was overcome by force.
Victim Alive During Intercourse
The defendant also claims that only a living being can be the victim of a rape, and that the state did not prove that the victim was alive when the aggravated rape occurred.[10]
*534 There is sufficient evidence that the victim was alive during intercourse. The bruises and palm print found by Dr. Mashburn on the victim's inner thighs show resistance, and therefore life at the time of intercourse. Additionally, by examining inflammatory changes and hemorrhaging under the victim's skin, Dr. Mashburn determined that the beating took place prior to death. The state's theory was that the victim was beaten, knocked unconscious, dragged into the woods and raped. During the course of the rape she regained consciousness, resisted, and the defendant strangled her. Dr. Mashburn testified that this theory was consistent with his autopsy findings. This theory is also consistent with what the defendant told Keith Collier only hours after the crime. Keith Collier testified that the defendant stated that he had vaginal and anal intercourse with the victim, and that he choked herwhile he was having sex with her. These facts are clearly sufficient to support the conclusion that Paula Manning was alive when the rape occurred.[11]
Assignment of Error XXIV has no merit.

CAUSE CHALLENGE (ASSIGNMENT OF ERROR I)
The defendant complains that the trial court erred in denying his challenge for cause of prospective juror, Gloria Rains, thus requiring him to exercise one of his peremptory challenges to excuse her, and thereby depriving him of the right to use the peremptorily challenge on another prospective juror.
An accused has the constitutional right to challenge jurors peremptorily, with the number of challenges to be fixed by law. La. Const. art. 1, § 17. Louisiana Code Crim.P. art. 799 provides the defendant in a death penalty case with 12 peremptory challenges. Therefore, when a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Robertson, 92-2660, p. 2 (La. 1/14/94); 630 So.2d 1278, 1280, citing State v. Monroe, 366 So.2d 1345, 1347 (La.1978), and State v. McIntyre, 365 So.2d 1348, 1351 (La.1978).
Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. To prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show: (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges. Robertson, 92-2660, p. 3 (La. 1/14/94); 630 So.2d at 1280-1281, citing State v. Ross, 623 So.2d 643, 644 (La.1993); State v. Bourque, 622 So.2d 198, 225 (La.1993); State v. Lee, 559 So.2d 1310, 1317 (La.1990); State v. Comeaux, 514 So.2d 84, 93 (La.1987); State v. Brown, 496 So.2d 261, 263-264 (La.1986).
In this case, it is undisputed that the defendant exhausted all of his peremptory challenges. Accordingly, we are left only with the task of deciding whether the trial court erred in denying defendant's challenge for cause of prospective juror Gloria Rains. "If so, then defendant's constitutional and statutory right to 12 peremptory challenges has been violated, prejudice is presumed, and there is reversible error requiring reversal of the conviction[s] and sentence." Robertson, 92-2660, p. 3 (La. 1/14/94); 630 So.2d at 1281.
The defendant's challenge for cause was based upon potential juror Rains' predisposition to automatically impose the death penalty in the event that the defendant was found guilty at the guilt phase of the trial. The grounds for which a juror may be challenged for cause are set forth in La.Code Crim.P. art. 797. Two of these grounds are pertinent here, namely, that "[t]he juror is not impartial, whatever the cause of his partiality," and *535 "[t]he juror will not accept the law as given to him by the court." La.Code Crim.P. art. 797(2) and (4).
In Robertson, supra, this Court summarized the applicable legal principles for reviewing the propriety of a trial court's denial of a cause challenge:
A trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. State v. Knighton, 436 So.2d 1141, 1148 (La.1983). A refusal by a trial judge to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. [State v.] Copeland, supra, 530 So.2d [526] at 534 [La.1988]. "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). As Chief Justice Calogero stated in Lee, supra, 559 So.2d at 1318 (citations omitted):
When a juror expresses a predisposition as to the outcome of a trial [or in this case, as to a particular sentence], a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct", isolated answers, or, for that matter, "incorrect", isolated answers.
Robertson, 92-2660, p. 4 (La. 1/14/94); 630 So.2d at 1281.
During initial voir dire examination by the prosecution, Ms. Rains stated that she believed that the death penalty was appropriate in particular cases, and could vote to impose the death penalty under certain circumstances.[12] Thereafter, the following exchange took place between Ms. Rains and the defendant's attorney:
Q Okay. I understand and you did tell the District Attorney that it would be possible for you to vote for the death penalty.
A [No answer from the prospective juror on tape but affirmative nod was noted in court reporter's shorthand notes.]
Q You understand the steps that I went over with Mr. Lee that have to occur before
A Uh Huh.
Q before it is imposed?
A [No answer from the prospective juror on tape but affirmative nod was noted in court reporters [sic] shorthand notes.]
Q Do you feel like that it should automatically be imposed if he is convicted of first degree murder?
A Yes.
Q Okay. Why is that?
A Because I believe that the crime that was committed if proved, rape and murder of you know the woman is one of the worst crimes in our society today.
Q Is your feeling about that so strong that you would not be willing to listen to or consider the alternative, life imprisonment, or to you know look at any of the reasons why the death penalty may not be appropriate?
A Well, I could listen to all of it.
Q But your feeling is right now, you seem pretty firm in that opinion, that you would vote to impose the death penalty given the conviction of the crime charged?
A Right.
Q In other words, conviction of the crime itself would be sufficient for you?

*536 A No, not the crime, the proof that he was guilty.
Q Of the crime?
A Of the crime, right.
Q Well, I want to be sure we are on the same page here
A If it is proven to me that he is guilty of this crime then you know I would vote for the death penalty.
The trial judge then questioned Ms. Rains. She described the judicial procedure employed in capital murder cases, particularly, the guilt and sentencing phases. She also explained to Ms. Rains that the jury must consider certain aggravating and mitigating factors when sentencing the defendant, and that at least one aggravating factor must be found to exist before the death penalty may be imposed. Finally, the trial judge explained that even if the jury finds that an aggravating factor is present, it may nevertheless choose not to impose the death penalty. At the conclusion of her explanation, the trial judge asked Ms. Rains whether she would automatically vote for the death penalty without considering mitigating evidence, to which Ms. Rains responded negatively.
Thereafter, when defense counsel resumed questioning, Ms. Rains again stated that she would not automatically vote for the death penalty. However, the trial judge's success in explaining the law to Ms. Rains was subsequently called into doubt when Ms. Rains responded to defense counsel's question about whether she would consider mitigating factors during the sentencing phase by asking, "What is mitigating?" Upon having mitigating factors defined by defense counsel, Ms. Rains indicated that she could listen to the evidence, consider mitigating factors and impose a sentence of life imprisonment. Nevertheless, the following exchange then took place between defense counsel and Ms. Rains:
Q ... Can you share with us what kind of circumstances in terms of both the crime and the offender that you feel would justify the death penalty?
A As I just stated the rape and murder.
Q Okay, okay. But you understand or are you saying that that would be a circumstance that would justify it
A Right.
Q but you would also look at the offender
A Right.
Q George Maxie?
A Right.
Q What kind of record he has, has he done this before and is he a violent person, would you also look at those kinds of things in deciding whether he got the death penalty, or would the mereI don't mean mere, but would the rape-murder itself be enough for you?
A Like I said you know it has to be proven to me, but I believe that is one crime you know today that definitely demands the death penalty if proven.
Q Well, you know it is made available for that crime.
A Right.
Q The law makes it available for that crime, but at the same time the law says you don't have to do it?
A Right.
Q But do you feel like you have got to do it if rape-murder is proven?
A Yes.
Q Bearing in mind you know what the Judge has said about looking at
A Right.
Q the other circumstances. Would that circumstance alone be enough for you to impose the death penalty?
A If as she [the trial judge] has stated the evidence was you know I would vote for the death penalty.
The District Attorney then examined Ms. Rains again. He spent a significant amount of time reexplaining the procedure used in capital murder cases, including the guilt and sentencing phases previously described by the trial judge. The District Attorney emphasized that the jury may choose either life imprisonment or the death penalty at the sentencing phase, and that nothing is automatic about the decision. He also stressed that the jury must be composed of 12 individuals that are not automatically predisposed either in favor of or against the death penalty, *537 and that will consider all of the evidence presented. At the close of his explanation, the District Attorney asked Ms. Rains if she would automatically vote for the death penalty if the defendant was found guilty, to which she responded that she would not.
Despite this response, Ms. Rains' voir dire ended with this colloquy with defense counsel:
Q Do you understand that rape alone, even aggravated rape, does not call for the death penalty?
A Yes.
Q I thought that might be
A Right.
Q where you were mis-connecting. The question remains then, what is your present disposition in terms of imposing the death penalty if he is convicted of first degree rape-murder?

A Death penalty. (Emphasis added.)
Q Right now?
A No, you said after he is proven guilty.
Q Okay, I am going to go over it again because I want to make sure we are communicating, and I thought you and Mr. Burkett [the District Attorney] communicated about that. What the law says is that in cases of first degree murder, whether it is rape-murder, armed robbery-murder or any other mind [sic] of first degree murder, the death penalty may be imposed in the discretion of the Jury
A Right.
Q or according to the Jury's decision. So by saying "may" it means that it is not automatic upon guilt being shown of first degree murder, you understand that?
A Uh Huh.
Q Maybe we are you knowthe two phases are kind of throwing you off a little bit. The first phase is the guilty-innocence phase.
A Right, I understand that.
Q Or if he is found guilty of first degree murder there
A Right.
Q then there is what is called the penalty phase.
A Uh Huh.
Q You know, and you don't come back as the Jury as the finding of guilt, what you come back with is either life or death. Do you understand that?
A Uh Huh.
Q Do you think you could do that?
A Yes.
Q You understood what Mr. Burkett said about you know the
A The two phases, right.
Q And we are simply trying to guard against people predisposed one way for the death penalty or the life imprisonment, you know, that's all we are doing by asking you all these questions. So, is your mind open to both the death penalty and life imprisonment if we reach the penalty phase of this trial?

A No. (Emphasis added.)
Q You understand now the procedure A We go through the guilty phase first
Q Yes, ma'am
A And then to the sentencing phase
Q Yes, ma'am
A I understand that perfectly.
Q But you feel right now that the death penalty ought to be imposed once the crime guilt

A Right.

Q gets established?

A Once the crime guilt is established. (Emphasis added.)
Defense counsel then unsuccessfully moved to challenge Ms. Rains for cause. Based on a reading of the entire voir dire of Ms. Rains, we find that the trial court committed reversible error in failing to grant the defendant's challenge. On the whole, Ms. Rains' responses indicated that she was predisposed to vote for the death penalty because of the "rape-murder" nature of this case. Even after the trial judge's explanations, she continued to exhibit an inability to accept the law as explained to her by the court. Her partiality was shown throughout the entire examination, and became particularly apparent during defense counsel's closing voir dire questioning, when: (1) Ms. Rains stated that she was presently disposed to impose the death penalty if the defendant was convicted of rape-murder; (2) Ms. Rains *538 responded negatively to the question of whether her mind was open to both the death penalty and life imprisonment; and (3) Ms. Rains agreed, in her response to the final question posed, that the death penalty should be imposed once the defendant's guilt was established. A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause by the defendant. Robertson, 92-2660, p. 8 (La. 1/14/94); 630 So.2d at 1284.

CONCLUSION
Ms. Rains displayed her inability to act impartially by stating several times that the death penalty was the only appropriate punishment in this first degree "rape-murder" case. Her final statements strongly indicate such a belief. When a juror holding such an opinion is not excused for cause, and the defense exhausts its peremptory challenges, as occurred here, there is reversible error. Therefore, the conviction of George Delano Maxie is reversed and the sentence vacated.
REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL.
WATSON, J., dissents, believing the trial judge did not abuse her discretion as to juror Rains.

ON APPLICATION FOR REHEARING
Rehearing denied.
WATSON, J., would grant a rehearing.
LEMMON, J., concurs with reasons.
LINDSAY, J., not on panel.
LEMMON, Justice, concurring in denial of application for rehearing.
On application for rehearing, the district attorney argues persuasively that since potential juror Rains was challenged because of her partiality favoring imposition of the death penalty in a rape-murder case, any error in denial of the challenge for cause had bearing only on the penalty phase. The district attorney therefore contends that even if the sentence of death must be reversed because of this error, there was no basis for reversal of the conviction for first degree murder.
This argument perhaps would be valid if potential juror Rains had actually served on the jury, rather than having been challenged peremptorily by the defense. However, Ms. Rains did not serve on the jury.
The harmless error analysis must focus not on the bias for which Ms. Rains should have been excused for cause, but rather on the fact that the defense was prejudiced by loss of a peremptory challenge on account of the error. Because of this prejudice as the ultimate result of the error, the error was not harmless.
I therefore concur in the denial of the application.
NOTES
[1] Judge Charles R. Lindsay, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, in place of Associate Justice James L. Dennis.

Lindsay, J., not on panel. Rule IV, § 3.
[2] This finding renders defendant's remaining assignments of error moot.
[3] Robert and Keith Collier are brothers.
[4] Paula Manning worked at City Hall for the Village of Florien.
[5] Louisiana R.S. 14:41 defines rape as follows:

A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
[6] Although the defendant does not specifically contend in this assignment of error that the state failed to prove his connection to the crime, he does attempt to make such inferences. This defendant's connection to the crime was established in a number of ways. First, by the matching palm print obtained from the sunglasses found in the victim's mobile home. Second, by the wrist watch that was taken from the victim and given to Keith Collier on the evening of the murder. Third, by the testimony of Marcus Garner, Keith Collier, and Robert Collier who all stated that the defendant told him that he raped and killed the victim.
[7] In a one sentence argument, defendant also claims that the portion of La.R.S. 14:30(A)(1) dealing with aggravated rape is vague. This argument is meritless. A statute is vague if its meaning is not clear to the average person or if an ordinary citizen of reasonable intelligence is not capable of discerning its meaning and conforming his conduct to it. State v. Barthelemy, 545 So.2d 531, 532-533 (La.1989), citing State v. Powell, 515 So.2d 1085 (La.1987); State v. Broom, 439 So.2d 357 (La.1983); State v. Stilley, 416 So.2d 928 (La.1982); State v. Baron, 416 So.2d 537 (La.1982). The first degree murder and aggravated rape statutes are unambiguous, employ straightforward language, and are clear to the average person. These statutes contain adequate standards by which guilt or innocence may be determined, and provide adequate notice of the proscribed conduct. State v. Barthelemy, supra.
[8] Defendant's Assignment of Error XIV asserts that the trial court erred in admitting crime scene photographs and autopsy photographs of the victim that were gruesome, highly prejudicial and of little probative value. We recognize that this case is being decided on other grounds and it is unnecessary for us to consider the merits of this assignment. However, insofar as Dr. Mashburn's opinions as to the severity of the beating and the bodily harm resulting therefrom were partially based upon the photographs, we note that Assignment of Error XIV is meritless.

It is well settled that a trial court's ruling with respect to the admissibility of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the evidence outweighs its probative value. It is equally well settled that postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location and placement of wounds, as well as to provide positive identification of the victim. State v. Martin, 93-0285, p. 14 (La. 10/17/94); 645 So.2d at 198; State v. Watson, 449 So.2d 1321, 1326 (La.1984); State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983); State v. Brogdon, 426 So.2d 158, 169 (La.1983). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 558-559 (La.1986) (citations omitted).
Here, the state was required to prove that the defendant killed the victim during the commission of an aggravated rape. Photographs depicting the way the victim's body was left, including the disheveled and torn condition of her clothing, the visible remnants of the severe beating inflicted upon her face and head, and the multiple bruises and abrasions ringing her neck, are relevant to prove the essential elements of the crime charged. The gruesome nature of the photographs do not outweigh their probative value, and they were properly admitted.
[9] Defendant's Assignment of Error XX asserts that the trial court erred in allowing Investigator DeLacerda and Detective McComic to give their opinions as to whether a struggle occurred in the yard. This is based upon the defendant's contention that experts in criminal cases are not allowed to testify as to the ultimate issue of the defendant's guilt or innocence. La.Code Evid. art. 704. Again, we recognize that this case is being decided on other grounds and it is unnecessary for us to consider the merits of this assignment. However, because we have considered Investigator DeLacerda's and Detective McComic's opinions as to the struggle in evaluating the sufficiency of the evidence, we note that Assignment of Error XX is meritless. Neither of these witnesses testified as to the defendant's guilt or innocence. They merely testified that after examining the crime scene, they found evidence that a struggle had recently occurred near the fence. The impressions of these officers regarding the struggle are corroborative in that they track details of the rape and murder supplied by the defendant to Marcus Garner and Keith Collier.
[10] Although we find it unnecessary to decide whether La.R.S. 14:42A(1) requires the victim to be alive at the time of intercourse, we note that this court has previously opined, albeit in dicta, that the definition of rape, contained in La.R.S. 14:41, would seem broad enough to encompass situations where the intercourse took place while the victim was alive or dead. State v. Eaton, 524 So.2d 1194, 1212 n. 6 (La.1988). But, see State v. Schmidt, 163 La. 512, 112 So. 400 (1927).
[11] Other examples of similar situations where evidence has been deemed sufficient to show that the rape victim was alive at the time of intercourse may be found in State v. Johnson, 575 So.2d 417 (La.App. 4th Cir.1991), writ denied, 578 So.2d 131 (La.1991), and State v. Wiley, 513 So.2d 849 (La.App. 2d Cir.1987), writ denied, 522 So.2d 1092 (La.1988).
[12] Following oral argument, the District Attorney filed a "Motion to Correct the Record." Therein, he stated that the original version of Ms. Rains' voir dire transcript contained numerous mistakes, and requested that a corrected transcript of her voir dire be filed into the record and considered. We granted the District Attorney's motion. Thus, all references to Ms. Rains' voir dire, quoted or otherwise, were taken from the corrected transcript.