STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**24-432**

STATE OF LOUISIANA

VERSUS

KRISTINA NICHOLE HOFFPAUIR

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 344,913
HONORABLE GREG BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**P.O. Box 52988**
**Shreveport, LA 71135-2988**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Kristina Nicole Hoffpauir**

**J. Phillip Terrell, Jr.**
**District Attorney**
**Kenneth A. Doggett, Jr.**
**Assistant District Attorney**
**Ninth Judicial District**
**P.O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**KYZAR, Judge.**

Defendant appeals her conviction for first degree murder. For the reasons herein, we affirm the conviction and the sentence of life in prison at hard labor without the benefit of parole, probation, or suspension of sentence.

## FACTS AND PROCEDURAL HISTORY

Defendant, Kristina Nichole Hoffpauir, was charged by grand jury indictment on October 22, 2019, with the first degree murder of Sherwood Emanual Doyle, in violation of La.R.S. 14:30(A)(5). Although Defendant pled not guilty on November 4, 2019, she later withdrew that plea on February 10, 2020, and entered a plea of not guilty and not guilty by reason of insanity. A sanity commission was appointed on October 25, 2021, and on August 9, 2022, Defendant was found competent to stand trial.

During the two-day trial, the jury heard testimony from the victim's three sisters, Sue Leonard, Eunice Reeves, and Glenn Odom; his granddaughter, Jessica Runge; as well as from Rapides Parish Sheriff's Office (RPSO) Detective Phillip Migacz and Corporal Nicholas Bradford; and Dr. Yen Van Vo, of the Rapides Parish Coroner's Office.[1]

Mrs. Leonard testified that she enjoyed a close relationship with the victim, who she saw nearly every day. She last saw the victim, aged eighty one, at her home on Friday night, August 2, 2019, and when she failed to see him the following day, she tried calling him multiple times but did not physically check on him. She stated that on the morning of Tuesday, August 6, 2019, while she was in Alexandria, she

---

[1] The jury also heard testimony from Dr. Jessica Boudreaux, a psychiatrist, who twice examined Defendant. It was her opinion that Defendant was not only competent to stand trial but that it appeared that she had not been suffering a psychological disturbance at the time of the offense, or, at least, not one which suggested she did not know right from wrong.

received a call from Mrs. Reeves, who was at the victim's home,[2] after which she called and asked Mrs. Odom to meet Mrs. Reeves there. Mrs. Leonard also contacted the victim's daughter, Belinda, to see if she had heard from him over the weekend, which resulted in Belinda's daughter, Ms. Runge, going to the victim's home. Mrs. Leonard further contacted someone with the RPSO to check on the victim but did not, herself, go to the victim's home. She stated that although she did not know Defendant, she was aware of her relationship with the victim, which she disapproved of based on the disparity in their ages. However, she stated that the victim was known for helping people who needed a place to stay.

Mrs. Reeves testified that she went to check on the victim at his home on August 6, 2019. Although his truck was there, the victim did not answer when she knocked on the front-porch door. When she called his phone, she heard it ringing inside the home but received no answer. She then walked to a door located on the side of the house, where she noticed yellow jackets on the porch and an awful smell, which she described as "like something, something dead." She tried looking into the house by shining a flashlight through a window but saw nothing. Mrs. Reeves testified that she then called Mrs. Leonard "and told her something was not right." She was in the yard when Mrs. Odom and Ms. Runge arrived. She stated that after their arrival, Defendant exited the house's front door and was restrained by Mrs. Odom and Ms. Runge. She said that prior to Defendant exiting the house, she asked her about the smell and was told that it was caused by a dead racoon. Mrs. Reeves stated that she was in shock and left after Defendant exited the house. She said that she did not know Defendant and was unaware of her relationship with the victim.

---

[2] According to Dr. Vo's autopsy report, the victim's home was located in Pitkin, Louisiana.

Mrs. Odom testified that she usually saw the victim nearly every day. Although she did not see him the weekend prior to August 6, 2019, she was not concerned until Mrs. Leonard called and told her to go to the victim's home. At Mrs. Leonard's suggestion, she brought a ball peen hammer with her in case she needed to break into the house. She described what occurred after she arrived:

> I went over there, and my sister Eunice was in the yard. And I told her, I said: I got this hammer. Sue told me to break it in if I could get in. And, she said: No, no, no, don't, don't come no closer. But I went, I almost hit the wall. That would have been where he was at. She wouldn't let me. And it was an awful, awful smell. I never smelled it before. Then I was hollering, to get in. Open the door. But the girl wouldn't open the door.
>
> . . . .
>
> And I said: Let me in, open the door. And she answered me: He is not here, he has gone to McDonald's to get us breakfast. I can't say what I called her. I'm not saying what I said.
>
> . . . .
>
> . . . I called her, you lying bitch, I know he has not went to McDonalds. Then she changed it and said he has went to his momma's house to get, to bring us back some breakfast. I said, I called her that again. I didn't call the other bad words. I said: If you don't open the door, I'm gonna [sic] break it down. But she then, she come out. I never seen her before. She opened it about like this, and she held it. And, I told her, I want in. She wouldn't let me in. But, she wanted to get out. But I got her by the arm. I held her. I still hurt. And she had a backpack on her back. And then, I still wouldn't let her out. And Jessica, somehow or another, she came underneath, right underneath there and she came out screaming.

Mrs. Odom testified that before Defendant exited the front door, she told her that she was "taking advantage of an old man. She said: I don't like old men." Mrs. Odom stated that after Ms. Runge ran out of the house screaming, someone took the hammer away from her and took her by her arms. She said that she continued holding Defendant by her arm until the deputy arrived. She stated, "I wanted to beat her up

3

with [the hammer]. Knock her in the head with it." She stated that she asked the deputy if she could do so, but was denied permission.

Mrs. Odom testified that she did not know Defendant but she was aware of and disapproved of the victim's relationship with her. She stated, "we told him, leave them women alone. . . . And he was taking care of her over there. He told us, he did, she had nowhere to go."

Ms. Runge testified that she spoke to the victim nearly every day, and she became concerned when she did not see him the weekend prior to August 6, 2019. On that day, she received a call from her mother, the victim's daughter, asking if she had heard from the victim. As she had not heard from him for several days, her mother asked her to go to his home to check on him. Ms. Runge went there, accompanied by her niece and her niece's friend. When she arrived, her aunts, Mrs. Odom and Mrs. Reeves, were in the front yard.

Ms. Runge recounted her actions following her arrival:

I tried to get in. My grandpa and me were very close so he always – there was on the side of the house, there's a wood board that was on the inside, but it could be pushed open. And he always left it like that so that I could get in because, at the time I was in an unusual relationship, a bad relationship. So, he always left that open so that I could get in if I ever needed. So, I went directly to the side of the house, and I pushed it. And when I pushed it, Kristina pushed it back . . . shut – which at the time, didn't know it was her. She, just somebody pushed it. And I said: Who's in there? And, she I guess recognized my voice and she said: Jessica, is that you? And I said Yes [sic]. And I said: Is that Kristina? and She said yes. And I said: Well let me in baby, I said, – me and her were pretty much friends, I mean I would talk to her when I would go over and, you know, we'd hug, or you know, just sit on the bed and talk. I said: can you let me i[n]. And she said: No, he's gone, and he doesn't want, he doesn't want me to let anybody in, he said especially not you. I said: Kristina, I know you're lying. And I said: pawpaw would never stop me from coming. I said: Just, just open the door. I just wanna [sic] know where my pawpaw is. And she said: He's gone, he, he left with someone in a red car. And I said: Are you talking about Cecily or Barbara or Shirah? And she said: yeah, yeah, yeah, them; And I said: which one? And she couldn't give me a name, but, I said: Well,

4

let me in. I said: I just wanna [sic] know where my pawpaw is. I said: I know he's not gone. I said: And what's that smell? . . .

. . . .

I said: what's that smell Kristina? And she said: it's a coon, I killed a coon and it's in the freezer. And I said: Kristina, open the door, I just need to know that my pawpaw is okay. Well, she wouldn't, so, I went around to the front of the house, and I started hitting the door, kicking the door, anything to get in. I told her, I said: Kristina, if you don't open the door – I said: When I get in there I'm gonna [sic] hurt you. . . . So, she came and she opened the door, but it was only like that much. She stuck her leg in the door and kind of held the door shut with her body. And she said, she said: Jessica, I can't let you in. He told me not to let anybody in. He'll be back. And I said: Kristina, pawpaw never went anywhere without his phone. I said: Why is his phone in the house? And she said: He forgot it. And I knew she was lying. And I said, I said: Kristina, I'm coming in. And she said: No you're not. So, I just pushed the door, she grabbed my arm. I think it was this arm she grabbed. And I was just pushing past her and I just kind of slung her off of me and I went through the house. None of the lights were on. I remember it being very hot in the house. I went straight to the room that I was trying to get into, and I noticed there was a mattress, kind of, I'd say taco'd [sic]. There was the wall and a dryer and then the mattress was kinda [sic] V'd [sic] in between the wall and the dryer. And, I kinda [sic] pulled the mattress and when I did, I tripped over it and I, I fell right on his chest. But it didn't register that, that it was him. I kind of sat there stunned for minute [sic], just laying [sic] on his chest. And I looked up and I could see him, but it wasn't registering. So, I ran to the door. There was a door that attached to the room that went outside. And I said I need a light. And I said: Bring me a flashlight, or a light of some kind. Just bring me a light. So, I grabbed a light, and I went back in. And there was my pawpaw, just – He [sic] was just laying [sic] there and there was, there was a blanket wrapped around him along with the mattress.

. . . .

I ran outside, and I, I screamed: You killed my pawpaw. My pawpaw's dead. I asked my niece Brianna to call the police. And I immediately ran toward Kristina. I can't say that I wasn't trying to get to her to hurt her. Because I think I was. But all I could say was: You killed my pawpaw. What happened to my pawpaw? Why is my pawpaw dead? And she, she was on the porch. And I was, I kind of - there was three steps leading to the porch and I was on the very top, still on the porch, but at the very top step. And I said: What happened? And, she said: I don't know, I don't know. She said: I've been dead for three days. I was stabbed in the head, and I just woke up and there was a dead guy laying [sic] next to me. And, at that point, she was trying to walk

5

off the porch, and Aunt Glenn had her cane and was just holding her at cane point.

Ms. Runge testified that Defendant was apparently next to the victim's body while speaking to her (Ms. Runge) through the window. She stated:

If you're in the room and you're facing the window, she opened, like she stuck her head out the right side of the window. And the mattress was covering all the way up to half of that window. Like, not covering, but it was underneath, all the way to about half that window. There's no way she could have been anywhere else but. It was a full sized [sic] mattress. She had to be on that mattress.

Ms. Runge testified regarding a photograph she took of Defendant on the porch, which showed her gasping and coughing. She said, "I'm assuming it was the smell that she had gotten used to from being in the house, had kind of hit her[,] and she was gagging and coughing and like trying to catch her breath." By the time the police arrived, Defendant was off the porch and approximately twenty-five feet from the house. She said that it appeared that Defendant did not know whether to run or stay.

According to Ms. Runge, the victim had several female friends, including Defendant, to whom he provided shelter when needed. She stated, "Most of these girls had problems at home, or had no where [sic] to go, were homeless. He would allow them to come stay[,] and he would feed them. He would get them clothing, you know, just anything they would need until they were ready to leave." Ms. Runge testified that Defendant had previously stayed with the victim and had been with him approximately three months at the time he was murdered.

Ms. Runge admitted that although Defendant was in the home when they arrived, she did not know how long she had been there. However, she stated that open drinks as well as papers that had been drawn on were located right next to the mattress where the victim was found. She said that while the victim did not draw, he

had in the past purchased canvases, paints, pencils, and charcoal for Defendant. She stated that she had seen drawings done by Defendant, including drawings she had done on the walls of the victim's bathroom. She testified that the drawings found next to the victim's body were similar to Defendant's past drawings.

Ms. Runge testified that she was aware that Defendant also stayed at times with a friend, Gary Loftin, who she understood had raped her. She stated that like the victim, Mr. Lofton allowed people to stay at his home, and although he knew Defendant stayed with the victim, he never exhibited any anger towards the victim when Defendant was with him. She further stated that she knew someone was staying in the house because of the opened drinks, drawing paper, and pens she saw next to the mattress. She said that the drawings appeared to have been recently done:

> [T]hey weren't discolored, they weren't bent up or crinkled or – I mean the tablet was sitting right next to the mattress, along with her pens and her paper. Along with the drinks, they were right next to the mattress. I, I can't see how they can be old and still be in that same exact spot.

RPSO Corporal Nicholas Bradford testified that he was dispatched to the victim's home after Ms. Runge reported that a rotten smell was coming from the home and that she was denied entry by a female inside the home. Shortly thereafter, he was informed that the victim had been found dead in the house and that there was a confrontation between Ms. Runge and the female. Corporal Bradford stated that when he arrived, Defendant was walking away from the home, carrying her belongings. He said that Ms. Runge told him that Defendant "was laying on his body and so, I went ahead and detained her and put her in handcuffs. Mrs. Glenn was talking about hitting her, talking about hitting Ms. Hoffpauir, so I went ahead and put her in the back of the car for her safety." Corporal Bradford testified that after

7

detaining Defendant, he went inside the home and saw the victim's body. At that point, he called in back up and began performing crowd-control duties.

The State introduced the video footage taken from Corporal Bradford's body camera into evidence. The video also contains audio. The video shows Corporal Bradford arriving at the house and exiting his vehicle. Defendant is already outside of the house and the victim's sister and two others are present. Defendant has a backpack and some other belongings with her, and she kneels down as Corporal Bradford approaches her. She states clearly, "I just woke up in this house." She then states, "I got stabbed in the head by somebody[,]" and "I just woke up in a house with a dead guy and some bitches screaming at me[,]" followed by "it has been three days." She then says, "I got pulled out of a couch bed." Defendant further states as she is being placed in the patrol car, "I been waking up periodically for a week with somebody stabbing me in the head."[3] Defendant's head is entirely visible in the video from multiple angles, and there appears to be no sign of bleeding or injury.

Detective Phillip Migacz, an RPSO crime-scene detective, testified regarding the evidence found at the scene. He stated that the majority of the evidence collected was found in the same room where the victim's body was located, and he identified twenty-eight photographs he had taken at the scene. These included the room where the victim was found as well as multiple items on which there appeared to be blood. Detective Migacz stated that a couch, located to the right of the door into the room, appeared to have blood on it. This sofa appears from the photograph to be a sofa bed and is adjacent to a clothes dryer. He identified a window, located towards the back of the room, that was covered with paneling; the dryer, which was pulled away from

---

[3] No objection was made to any of the statements made by Defendant as they appeared to be spontaneous and not the result of any custodial interrogation.

8

the wall; pots and pans that were located on the dryer; and a mattress that was leaning up against the back wall.

Detective Migacz identified photographs of a pressure cooker, a frying pan, a knife, and a screwdriver, all of which appeared to have blood on them. Other items which appeared to have blood on them were a towel, identified as having been found in the bathroom, and several pieces of feminine clothing and shoes. He further identified photographs depicting blood on the floor and on the wall near where the victim was found. Another photograph depicted the decayed body of the victim wrapped in a blanket, with a belt around his neck.

Dr. Yen Van Vo, a forensic pathologist, performed an autopsy on the victim's body. She testified that although her report listed the victim's date and time of death as August 6, 2019, 13:13 hours, that actually indicated when the victim was found and declared dead by the Rapides Parish Coroner's Office. She stated that she had no way of accurately determining the length of time the victim was dead before his body was found.

Dr. Vo opined that the victim died as a result of a homicide, with his death caused by a combination of three injuries, as depicted in eight photographs taken during the autopsy:

> Cause of Death is stated as blunt force injury of head and neck, asphyxia due to ligature strangulation and stab wound of neck. So there are three combined, you know, causes of death in this case. And you can find the summary of it under Findings. The first one, blunt force injuries of head and neck, meaning that there was injury to the head as well as the neck that is from a blunt object. So, that can be anything, that can be a fist, a bat, the wall, the floor. So, he exhibited injuries to his head and neck from a blunt object. Additionally he had a ligature around his neck. So, there were injuries in the neck that would be consistent with being asphyxiated or being strangled. Additionally he, Mr. Doyle, sustained a stab wound. So a stab wound is a sharp force injury, injury from a sharp object, for example, a knife. He had a stab wound to the left side of his neck.

9

Following the close of evidence, the jury unanimously found Defendant guilty of first degree murder. She was later sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This appeal followed.

In her sole assignment of error, Defendant argues that there was insufficient evidence to find her guilty of first degree murder.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## OPINION

Defendant puts forth the sole issue of insufficiency of evidence to sustain her conviction. In order to convict Defendant of first degree murder, the State was required to prove that the victim was killed, that he was over the age of sixty five, that she was the perpetrator of the killing, and that she had the specific intent to kill or to inflict great bodily harm. La.R.S. 14:30(A)(5). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent may be inferred from a defendant's actions and the circumstances surrounding the incident. *State v. Maxie*, 93-2158 (La. 4/10/95), 653 So.2d 526.

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of

10

the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing *State v. Captville*, 448 So.2d 676, 678 (La.1984)).

> When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *Neal*, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id.* (citing *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)).

*State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18, *cert. denied*, 547 U.S. 1022, 126 S.Ct. 1569 (2006).

Here, the State proved beyond a reasonable doubt that a crime was committed,

i.e., that the victim was murdered.

> The Louisiana Supreme Court has noted that "[t]he overwhelming weight of authority is to the effect that there cannot be a lawful conviction of a crime unless the corpus delicti is established; that is to say, unless it is shown that a crime has been committed by some one [sic]." **State v. Morgan**, 157 La. 2, 963, 103 So. 278, 279 (1925); see also **State v. Hayden**, 171 La. 495, 503, 131 So. 575, 578 (1930) ("[C]orpus deliciti . . . must be established in every prosecution and . . . does not pertain to the guilt or innocence of the particular accused . . . ."). Thus, "it is well established that an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime has been committed by someone; in other words, without proof of the corpus delicti." **State v. Freetime**, 334 So.2d 207, 210 (La. 1976). Moreover, "[p]roof that defendant was the person who engaged in this unlawful conduct is of course necessary for a conviction, but it is not an element of the corpus delicti." **Freetime**, 334 So.2d at 210. The corpus delicti must be proven by evidence which the jury may reasonably accept as establishing that fact beyond a reasonable doubt. **State v. Willie**, 410 So.2d 1019, 1029 (La. 1982), appeal after remand, 436 So.2d 553 (La. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984); **State v. Trahan**, 2010-0554, p. 6 (La. App. 1st Cir. 10/29/10), 2010 WL 4272859 (unpublished), writ denied, 2010-2631 (La. 9/2/11), 68 So.3d 523. Additionally, "independent proof need not go to every element of the offense; and, it may be direct or circumstantial in nature." **State v. Fisher**, 2013-1152, p. 3 (La. App. 1st Cir. 6/6/14), 2014 WL 3765945 (unpublished).

*State in Interest of J.S.*, 18-1245, pp. 5-6 (La.App. 1 Cir. 12/21/18), 268 So.3d 311, 316-17 (second alteration ours).

The evidence established beyond any reasonable doubt that the perpetrator had the specific intent to kill based on the manner in which the victim was murdered. The evidence showed, without contradiction, that the eighty-one-year-old victim was strangled, stabbed, and beaten to death. The fact that all three methods were utilized in the murder is proof of specific intent, just as multiple stabbings can be proof of specific intent to kill. *See State v. Martinez*, 09-740 (La.App. 5 Cir. 3/23/10), 38 So.3d 926. The only question remaining is whether the evidence established beyond a reasonable doubt that Defendant was the perpetrator of this crime.

Defendant argues that the State presented insufficient evidence to convict her of murder as it presented no blood, fingerprint, or DNA evidence linking her to the victim's murder or evidence of injuries she may have suffered while bludgeoning, stabbing, and asphyxiating the victim to death. She further notes that the State offered no proof of how she was able to move the victim's body, which outweighed her by more than fifty pounds.

Defendant further argues that the evidence established that there were other individuals who had a motive and opportunity to murder the victim. This was based on testimony that the victim allowed a number of homeless women to stay with him. She claims that any one of these women or an associate could have murdered the victim, and the State failed to introduce evidence establishing their whereabouts between August 1–6, 2019 or offer evidence of the contents of the victim's phone, which was found at the crime scene.

Although Defendant concedes that she was in the home with the victim's body, she argues that this only established her desperate need for a safe place to stay. Thus, she chose to remain with the victim's body rather than return to the home of

12

Mr. Lofton, a man who had raped her repeatedly.[4] Defendant further contends that no evidence was introduced establishing the length of time she was in the home or how long the victim had been dead when she discovered his body. Based on the foregoing, Defendant argues that no reasonable juror could have found beyond a reasonable doubt that she murdered the victim simply because she was in his home as an invited guest, albeit with the victim's body.

The State, on the other hand, argues that the evidence was sufficient to support the jury's verdict.

There is no question that the victim was murdered. However, as there is no direct evidence linking Defendant to the crime, her identification as the perpetrator was based entirely on circumstantial evidence. Therefore, to convict, the State needed to exclude every reasonable hypothesis of innocence. La.R.S. 15:438; *State v. Camp*, 446 So.2d 1207 (La.1984).

Defendant's primary hypothesis of innocence was that the victim's murderer could have been one of the other women who stayed with him or one of their acquaintances.[5] For the sake of brevity, we will address all of Defendant's claims together. While the State admittedly introduced no evidence exonerating these women, the jury, nonetheless, rejected this hypothesis given the unanimous guilty verdict returned in this matter. Therefore, this court must evaluate whether the rejection was reasonable.

---

[4] While there was hearsay testimony from witnesses that they had heard Defendant had been raped by Mr. Lofton, there was no direct evidence.

[5] The only acquaintance mentioned during the trial was Mr. Lofton, who allegedly was Defendant's friend.

13

Regarding whether another woman/acquaintance killed the victim, the jury considered the following evidence. Ms. Runge testified that Defendant was the woman who had stayed with the victim for approximately three months prior to his murder, not one of the other women. She testified that Defendant spoke to her from the room where the victim's body was found and had to be, essentially, standing over the body when she did so; that she lied about the victim's whereabouts; that she failed to answer Ms. Runge's question regarding the identity of the woman she said the victim had supposedly left with; that she lied about the source of the smell; and that she tried to prevent the family from entering the home.

The jury also heard, through Ms. Runge's testimony and from the bodycam video, Defendant's attempt to account for her presence in the home with the victim's decayed body. She claimed to have been "dead" for three days after being stabbed in the head, and when she woke up, she was lying next to a dead man. She then said she had been in the house for a week. However, neither Ms. Runge's photograph of Defendant taken before Corporal Bradford's arrival nor Corporal Bradford's bodycam footage reveals evidence of any head injury suffered by Defendant.

While the jury could confirm from the photograph and bodycam footage that Defendant had no blood on her at the time of her arrest, multiple days had passed since the victim was last been seen by his family. Also, while the coroner's office reported the victim's date and time of death as August 6, 2019, at 13:13 hours, Dr. Vo explained that this reflected when the victim was found and declared dead by the coroner's office. Moreover, although Dr. Vo could not accurately determine the time of death, the victim's body exhibited evidence of postmortem changes or decomposition. The state of decomposition was also evident from the photographic evidence. Considering the testimony of the victim's relatives, the photographic

14

evidence of decomposition, the victim's autopsy report, and the testimony explaining how the time of death was determined, the jury could have reasonably concluded that a notable time had passed from when the victim was murdered to when his body was discovered. This is also consistent with Defendant's statement of being in the house with the body between three to seven days. Given the time between the death and the discovery of the victim's body, the absence of blood or other indicia of murder was explainable. Also notable was the exhibit photograph of a bloody towel shown to have been located in the bathroom, consistent with the inference that Defendant had cleaned up after the murder.

Lastly, although the manner in which the victim was beaten, strangled, stabbed, dragged, and covered with the mattress calls into question whether Defendant was physically strong enough to perform those actions, the jury could reasonably have found her capable of murdering the eighty-one-year-old victim. In addition to his age, the evidence established that the victim weighed only 165 pounds at the time of his death. According to the indictment, Defendant was thirty-seven-years old at the time of her arrest, and although no evidence was introduced establishing her weight, she was present in the courtroom during the trial. Thus, based on its observation of Defendant and its consideration of other evidence, the jury could reasonably have found her capable of murdering a victim, who was forty-four-years older than her. In addition, it is noted that the medical examiner, Dr. Vo, stated that the blunt force injury to the head was one of the causes of death. From the autopsy report and photographs of the injury, the jury could infer that this injury was inflicted initially and was sufficient to incapacitate the victim rendering him incapable of fighting back or resisting his attacker.

15

Here, the jury's determination of guilt was based almost entirely on its weighing of witness credibility, as is their role. *State v. Kennerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367. Still, "the testimony of a single witness," if believed and "absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction." *State v. Jeter*, 09-1004, p. 3 (La.App. 3 Cir. 4/7/10), 33 So.3d 1041, 1043. "The credibility of the witness is a matter of weight of the evidence, not sufficiency, and determination of the credibility is left to the trier of fact's sound discretion and will not be re-weighed on appeal." *Id.* at 1044.

Given the testimony detailing the circumstances in which Defendant was found at the scene of the murder with the victim's body and her bizarre behavior, changing inculpatory statements, and refusal to allow entry into the house, along with the evidence and testimony establishing that the murder occurred sometime prior to the discovery of the body and that Defendant had been staying with the victim for a number of weeks, the jury reasonably rejected any other hypothesis of innocence. Accordingly, we affirm Defendant's conviction and sentence.

## DECREE

Defendant's conviction for first degree murder and sentence of life in prison, at hard labor, without benefit of parole, probation, or suspension of sentence, is affirmed.

**AFFIRMED.**

16