STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-267

STATE OF LOUISIANA

VERSUS

TANESHA HARDY

************

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C16019
HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE

************

J. DAVID PAINTER
JUDGE

************

Court composed of John D. Saunders, J. David Painter, and James T. Genovese,
Judges.

AFFIRMED.

Van H. Kyzar, District Attorney
R. Stuart Wright, Assistant District Attorney
Tenth Judicial District
P.O. Box 838
Natchitoches, LA  71458-0838
COUNSEL FOR THE STATE OF LOUISANA

Carey J. Ellis, III
Louisiana Appellate Project
P.O. Box 719
Rayville, LA 71269
COUNSEL FOR DEFENDANT/APPELLANT:
    Tanesha Hardy

**PAINTER, Judge**

Defendant, Tanesha Hardy, appeals her conviction on the charge of second degree murder. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

On October 17, 2009, Defendant shot the victim, Walter Johnson (also known as "Dinky"), three times. He died as a result of the gunshot wounds.

Defendant was indicted on January 6, 2010, for second degree murder, a violation of La.R.S. 14:30.1. A jury trial commenced on July 19, 2010, and on July 20, 2010, she was found guilty as charged. On August 18, 2010, Defendant was sentenced to life imprisonment. Defendant did not file a motion to reconsider the sentence.

Defendant now appeals, asserting that the evidence was insufficient to sustain the verdict of second degree murder and that the trial court erred when it allowed a conviction by a non-unanimous vote. For the following reasons, we find that the evidence was sufficient to sustain the verdict of second degree murder and that there was no error in the trial court's ruling regarding the ten-to-two verdict for second degree murder.

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

*Sufficiency of the Evidence*

Defendant argues that there was insufficient evidence to support a conviction for second degree murder in that she had no choice but to shoot the

1

victim. At the time she fired the shots, she alleges that she believed that the victim was reaching for a gun.

In *State In re D.P.B.,* 02-1742, pp. 4-6 (La. 5/20/03), 846 So.2d 753, 756-57 (footnotes omitted), wherein the defendant had asserted justifiable homicide, the supreme court observed:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984). . . . Furthermore, in a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

Second degree murder is defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. Justifiable homicide is defined, in pertinent part, as a killing when committed in self-defense by one who reasonably believes that "he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1).

Jessica Young Williams, a detective with the Natchitoches Police Department, was called to an apartment on Washington Street at approximately 11:00 p.m. on October 17, 2009. She found ambulance personnel on the scene. She also found the victim, lying on the couch of his sister's apartment, with three gunshot wounds. The victim died at the scene. Also in the apartment were several people, including two sisters, several children, and Dikianna Berguin. Detective

2

Williams was told that Defendant was the shooter and that she had fled. The detective also located several casings from a .45 caliber pistol and an unspent bullet from a .380 caliber handgun. However, the detective did not find any weapons in the apartment.

Detective Williams located Defendant in the early morning hours of October 18, 2009, at a house on Lucille Street. Defendant surrendered without incident. Inside the residence, the detective located a semiautomatic .45 caliber pistol. She testified that upon apprehension, Defendant asked her if the victim was dead. When she was told that the victim had died, she stated that she had no choice but to shoot him.

A video interview with Defendant was played for the jury. During the interview, Defendant related an acrimonious history with the victim, which started a few months before with the shooting of her cousin. However, she also related that she and the victim "had a little falling out about Dikianna." She said that a few days prior, she had kicked Dikianna out of her house because Dikianna had been sexually involved with the victim. However, on the afternoon of the shooting, she went to the victim's sister's apartment to get Dikianna and take her home. She said that the victim came out of the apartment, argued with her, and showed her a gun that he had in the waistband of his pants. She stated that she left, but after she calmed down, she called the apartment but was not allowed to talk to Dikianna. She said that she called twice. Later, she went to the apartment to again try to talk Dikianna into coming home. She said that Dikianna opened the door when she knocked, and she saw the victim lying on the couch with a "mug on his face. And he was sticking his hand under the cover, pretty fast." Defendant told the detectives that she believed that the victim was reaching for a gun under the

3

covers, "[s]o I pulled the gun out. I just started . . . I just started shooting." A transcription of the interview was put into the trial record.

Dikianna testified that she had known Defendant for a few years and had lived with her for about six months prior to the shooting. However, Defendant had kicked her out because Defendant had heard that she was sleeping with the victim. On the day of the shooting, Dikianna and the victim's sisters and their children had gone to a fair, where they saw Defendant. Later, in the afternoon, Defendant went to the victim's sister's apartment. Dikianna stated that the victim was there and that he was "talking crazy to her [Defendant] . . . just kept running up to her telling her he was gonna [sic] slap her[.]" Dikianna testified that, on the night in question, she and the victim were lying on a couch watching television when there was a knock at the door. Dikianna testified that she answered the door and was not surprised to see Defendant. Defendant asked who was in the apartment. Dikianna testified that Defendant appeared calm and that as she turned to point out all who were there, Defendant began shooting.

Dr. Charles Curtis, the coroner for Natchitoches Parish, testified that the gunshot to the victim's neck was the cause of his death. Richard Beighley, a criminalist with North Louisiana Crime Laboratory, testified that the gun retrieved from the house where Defendant was apprehended was the gun that discharged the bullets recovered from the victim.

Defendant argues that she has consistently maintained that the victim had a gun and that her only alternative was to shoot first. She argues that a thorough review of the record reveals reasonable doubt concerning her guilt. In *State v. Patterson*, 10-415, p. 13 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 149, *writ denied,* 11-338 (La. 6/17/11), 63 So.3d 1037, the fifth circuit noted:

4

The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. [*State v.* ] *Theriot*, 07-71 at 12, [La.App 5 Cir. 6/26/07),] 963 So.2d [1012] at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. *Theriot,* 07-71 at 13, 963 So.2d at 1020.

Furthermore, while discussing self-defense in the case of a second degree murder conviction, this court has held:

> The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable. *State v. Brown,* 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.
>
> > Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Hardeman,* 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown,* 414 So.2d 726 (La.1982).
>
> *State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.
>
> > In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. *See State v. Davis,* 28,662 (La.App. 2d Cir.9/25/96), 680 So.2d 1296. . . . The absence of weapon on the victim, however, is not dispositive of the issue.
>
> > . . . .
>
> *State in Interest of D.S.,* 29,554, p. 3 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, 567.

*State v. Griffin,* 06-543, pp. 8-9 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, *writ denied*, 07-02 (La. 9/14/07), 963 So.2d 995.

5

During her videotaped interview, Defendant stated that she had had problems with the victim for several months. It was unclear, but apparently there was a shooting incident a few months prior that involved the victim and Defendant's cousin, who was married at one time to one of the victim's sisters. Defendant stated that after he showed an interest in Dikianna and after Defendant had told him to stay away, he started coming around her house and "get to going off about, you know, he'll use his guns and all that." Defendant said that at one point "we had to leave for about a month [;]. . . they made us leave home and go stay with a friend[; and,] they say until everything calm [sic] down." She claimed that she gave "statements" and "wrote reports . . . but that still didn't stop anything."

Based on our review of the record, Defendant did not show a reasonable belief that the use of deadly force was necessary to avoid imminent danger and that the State's evidence negated the self-defense claim beyond a reasonable doubt. Detective Williams testified that although an unspent .380 caliber bullet was found under the couch, no gun was found on the body of the victim or anywhere in the apartment. Except for Defendant's self-serving statements made during the videotaped interview, there was no testimony that the victim ever made verbal threats to Defendant. There was no testimony regarding whether the victim had a violent nature. At the time of the shooting, the victim was lying on a couch, and, according to testimony, Defendant immediately began shooting as she walked into the apartment without a word or gesture from the victim. Therefore, we find no merit to this assignment of error.

_Louisiana Code of Criminal Procedure Article 782_

Defendant states in brief that after the verdict of second degree murder was pronounced by a ten to two vote, she "objected to the non-unanimous verdict. The

6

Court noted the Defense objection but permitted the verdict to stand." Defendant

argued that La.Code Crim.P. art. 782, which allows for non-unanimous verdicts

when the punishment involves incarceration at hard labor (but not for capital

offenses), was unconstitutional. According to Defendant, the trial court erred

when it denied her objection to the non-unanimous decision.

In brief, Defendant argues that this court should ignore the plurality ruling of

*Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628 (1972), and hold that a ten to

two verdict fails to satisfy due process of law. In *Apodaca*, the United States

Supreme Court upheld non-unanimous verdicts in state felony cases. The

Supreme Court concluded that the Sixth Amendment's jury trial guarantee did not

require unanimous verdicts. The holding of *Apodaca* was discussed with

approval by the Louisiana Supreme Court in *State v. Bertrand,* 08-2215, La.

3/17/09), 6 So.3d 738, while reviewing a Louisiana judicial district court's

declaration that Article 782 was unconstitutional for the reason that it permitted

non-unanimous verdicts. The Louisiana Supreme Court stated:

> In *Apodaca*, the United States Supreme Court examined an
> Oregon statute similar to Article 782, in that the Oregon statute did
> not require unanimous jury verdicts in noncapital cases. In a plurality
> decision, the Court determined that the United States Constitution did
> not mandate unanimous jury verdicts in state court felony criminal
> trials, with four Justices holding that the Sixth Amendment guarantee
> of a jury trial, made applicable to the States by the Fourteenth
> Amendment, does not require that a jury's vote be unanimous. Justice
> Powell concurred in the judgment of the Court for reasons different
> than those expressed by the author of the opinion. Four Justices,
> disagreed, finding that the Sixth Amendment guarantee of a jury trial
> was made applicable to the States by the Fourteenth Amendment, and
> does require a unanimous jury.
>
>     . . . .
>
> This Court has previously discussed and affirmed the
> constitutionality of Article 782 on at least three occasions. In *State
> v. Jones*, 381 So.2d 416 (La.1980), we ruled that Article 782 did not
> violate the Sixth and Fourteenth Amendments. Later, in *State v.
> Simmons*, 414 So.2d 705 (La.1982), we found that Article 782 did not

7

violate either the Fifth or Fourteenth Amendments. Finally, in *State v. Edwards*, 420 So.2d 663 (La.1982), we again affirmed the statute's constitutionality.

Despite defendants' arguments to the contrary, the case law of the United States Supreme Court also supports the validity of these decisions. Although the *Apodaca* decision was, indeed, a plurality decision rather than a majority one, the Court has cited or discussed the opinion not less than sixteen times since its issuance. On each of these occasions, it is apparent that the Court considered that *Apodaca's* holding as to non-unanimous jury verdicts represents well-settled law. For instance, in *Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 1626-27, 60 L.Ed.2d 96 (1979), the Court matter-of-factly recognized the reasoning behind the *Apodaca* holding as support for its overturning of a jury conviction by a 5-1 margin. Further, in *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 823, 107 L.Ed.2d 905 (1990) (Stevens, J., dissenting), Justice Stevens stated that it was the fair cross section principle underlying the Sixth Amendment's right to a jury trial that permitted non-unanimous juries. Justice Scalia, a noted originalist on the Court, explicitly rejected a unanimity requirement in his dissent *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369(1990), saying:

> Of course the Court's holding today -- and its underlying thesis that each individual juror must be empowered to "give effect" to his own view -- invalidates not just a requirement of unanimity for the defendant to benefit from a mitigating factor, but a requirement for any number of jurors more than one. This it is also in tension with *Leland v. Oregon* (citation omitted), which upheld, in a capital case, a requirement that the defense of insanity be proved (beyond a reasonable doubt) to the satisfaction of at least 10 of the 12-member jury. Even with respect to proof of the substantive offense, as opposed to an affirmative defense, we have approved verdicts by less than a unanimous jury. *See Apodaca v. Oregon* (citation omitted) (upholding state statute providing for conviction by a 10-to-2 vote).

*McKoy*, 110 S.Ct. at 1246-47 (Scalia, J., dissenting) (emphasis in original). Likewise, in United *States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995), the Court, in a unanimous opinion, recognized the reasoning behind the *Apodaca* decision. Finally, Justice Souter, dissenting in *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2484, 168 L.Ed.2d 203, (2007) (Souter, J., dissenting), again recognized the *Apodaca* holding as well-settled law.

*Id*. at 741-42.

Defendant has presented no original argument as to why this court should find the statute unconstitutional other "than wait for a higher court to correct this wrong." Therefore, there is no merit to this assignment of error.

## DECREE

For all of the foregoing reasons, Defendant's conviction on the charge of second degree murder is affirmed.

**AFFIRMED.**