NOT DESIGNATED FOR PUBLICATION


STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-691


STATE OF LOUISIANA

VERSUS

ERIC ABSHIRE


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR-135356
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and John E. Conery, Judges.


CONVICTIONS AND SENTENCES AFFIRMED
WITH INSTRUCTIONS.

**Keith A. Stutes**
**Lafayette Parish District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Eric Abshire**

**SAUNDERS, Judge.**

Defendant, Eric Abshire, was indicted for the July 27, 2011, first degree murders of Lemuel Brown and Lona Carter, violations of La.R.S. 14:30, one count of possession of a controlled dangerous substance, Schedule IV, a violation of La.R.S. 40:969, and one count of possession of a firearm while in possession of a controlled dangerous substance, in violation of La.R.S 14:95.

A jury trial commenced on March 24, 2015, on the first degree murder charges. On March 26, 2015, the jury returned a verdict of guilty as charged on both counts of first degree murder. Following dismissal of the jury, Defendant made an oral motion for a new trial, which was denied. Defendant then waived all time delays and was sentenced to two consecutive terms of life imprisonment without the benefit of parole, probation, or suspension of sentence.

Defendant has perfected a timely appeal, wherein he asserts four assignments of error:

> 1. The State failed to present sufficient evidence that Eric Abshire killed the victims in this case and did not negate the reasonable probability that he simply arrived at their house shortly after the murders occurred.

> 1. Eric Abshire's constitutional rights to due process and a fair trial were violated by the trial court's refusal to allow the defense to introduce exculpatory evidence created by agents of the State which proved he was at or near his house at the time of the shooting.

> 3. The less than unanimous verdict to convict by the jury violated Eric Abshire's due process rights, as applied in this case, because when reasonable jurors can differ as to guilt, the State has *per se* failed to prove its case beyond a reasonable doubt.

> 4. Defense Counsel was ineffective in this case for waiving sentencing delays in this case and failing to file a Motion for New Trial after it came to light that *Brady* evidence may not have been provided to the defense.

For the following reasons, we find that the evidence was sufficient to sustain the verdict, thereby finding that assignment of error number one is without merit,

and that there is no merit to the assignments of error number two and three. Assignment of error number four is relegated to post-conviction. Accordingly, we affirm the convictions and sentences.

**FACTS:**

After consuming crack cocaine and alcohol with the victims, Lona Carter and Lemuel Brown, Defendant shot Carter and Brown in their home. Both victims died as a result of the gunshot wounds.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent. However, the court minutes of sentencing require correction. The sentencing transcript indicates that on each count, the judge imposed a life sentence at hard labor without the benefit of parole, probation, or suspension of sentence to run consecutively to each other. The sentencing minutes state, "The Court sentenced the defendant to life imprisonment on each count with credit for time served, consecutive with each other. Sentence is without probation."

"[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Thus, the trial court is ordered to amend the minute entry of sentencing to correctly reflect the sentence imposed.

**ASSIGNMENT OF ERROR NUMBER ONE:**

Defendant argues that eyewitness testimony established that he was not the man the witness saw entering the victim's house just minutes before shots were heard. He contends that the evidence the State presented was entirely circumstantial and that the State failed to exclude the reasonable probability that he

did not shoot the victims but rather arrived at their house after the shooting and fled the scene in panic without calling for help.

In *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, this court held:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson,* 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

In *State v. Williams*, 13-497, pp. 4-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1240, *writ denied,* 13-2774 (La. 5/16/14), 139 So.3d 1024, this court discussed direct and circumstantial evidence, as follows:

> "Evidence may be either direct or circumstantial." *State v. Jacobs*, 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied*, 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied*, --- U.S. ----, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams*, 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton*, 436 So.2d 471 (La.1983)), *writ denied*, 00-[30]99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.
>
> In *State v. Chism*, 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

3

Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

In order to convict Defendant of first degree murder, the State was required to prove, in this particular case, that Defendant possessed the "specific intent to kill or to inflict great bodily harm upon more than one person." La.R.S. 14:30(A)(3). Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S.14:10(1). "Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Maxie*, 93-2158, p. 11 (La.

4/10/95), 653 So.2d 526, 532 (citing *State v. Graham*, 420 So.2d 1126 (La.1982)). Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. *State v. Seals*, 684 So.2d 368, 373 (La.1996), *cert. denied*, 520 U.S. 1199, 117 S.Ct. 1558 (1997) (citing *State v. Williams,* 383 So.2d 369 (La.1980); *State v. Procell,* 365 So.2d 484 (La.1978), *cert denied*, 441 U.S. 944, 99 S.Ct. 2164 (1979)).

At trial, the following evidence was presented to the jury.

Kevin Prejean was a friend of Mr. Brown and his step-daughter, Ms. Carter. He testified that he visited them almost every day. He stated he was aware that Ms. Carter used drugs. He also stated that she had various men visit her, including Defendant, who often stayed with her for several days at a time. He believed she and Defendant had a sexual relationship. Mr. Prejean testified that Defendant was at Ms. Carter's house on Tuesday, July 26, 2011. Defendant was there when Mr. Prejean left to go home around 8:30 p.m.

Mr. Prejean testified that Defendant drove a four-door, GMC, light green/bluish truck. He stated the truck was not at the victims' house when he returned the following morning, around 7:00 a.m. Although normally the front door would have been unlocked, when Mr. Prejean arrived, the front door was locked. However, Mr. Prejean had a key to the front door. He explained that to lock the door one would push a button in the doorknob inside and then pull the door shut behind them. The first thing Mr. Prejean saw when he opened the door was Mr. Brown's legs on the kitchen floor. At first he thought the old man just fell down. Mr. Brown was "on his back with his hand on his forehead in a puddle of blood." Mr. Prejean hollered his name, but Mr. Brown did not move. Mr. Prejean stated that when he entered the kitchen, he noticed that Mr. Brown had been frying chicken and that the burner was still on low. He turned the burner off. Mr. Prejean

5

then ran down the hall to Ms. Carter's room. He found her "laying on the bed. Part of her body was out of the bed, and I shook the mattress real, real hard like a bunch of time, and I kept hollering her name and she never moved."

Mr. Prejean called 911, then his wife, and then Defendant. He said that when Defendant answered the phone and he yelled Defendant's name, Defendant hung up. Mr. Prejean ran outside and waited for the police to arrive. Mr. Prejean told the police about Defendant being at the house the night before and about an ex-boyfriend of Ms. Carter's. He provided the police with Defendant's and the ex-boyfriend's phone numbers. He also told the police that he had noticed that Mr. Brown's wallet appeared to be missing as it was not in its usual spot in the living room.

Mr. Prejean said that about 10:00 p.m. the evening before, Ms. Carter had called him and said there was someone pounding at the front door. She told Mr. Prejean it was a man from down the street, looking for his girlfriend. Mr. Prejean also told the police about a Mexican who visited with Ms. Carter often, who had a truck similar in color to Defendant's truck, but it was a two-door rather than a four-door truck. At trial, Mr. Prejean identified Defendant's truck.

Chad Duhon testified that from the back of his property on Edna Street in Lafayette, he could see the front of the victims' house on Warren Street. He described the distance from his back yard across a field to the front of the victims' house as being approximately one hundred twenty yards. Mr. Duhon testified that on the morning of the 27th, he got up about 4:00 a.m. and left his house. He stated that he returned at approximately 6:00 a.m. He was fairly certain of the time because he had stopped at Starbucks to get coffee for himself and his wife, and he had to wait for Starbucks to open at 5:30 a.m. He said it took about fifteen to twenty minutes to get from Starbucks to his house. Once home with his coffee, he

6

went outside to smoke a cigarette. Mr. Duhon saw a "green truck with dark tinted windows" drive up to the victims' house, then back up and park parallel to the house. He saw a man get out of the vehicle, heard him cough, and watched him walk around in front of the truck to the front door of the house. He stated his line of sight was obstructed by the truck, but he could see the top of the front door shift back and forth and then open. Mr. Duhon stated he heard a "pop," which he described as the sound of a branch hitting a tin roof. He heard a second "pop." He waited a few minutes to see if anyone came out, but when no one did, he went inside and thought no more of it. Around 10:00 a.m., a neighbor told him some people were killed in his back yard. He went out to his back yard and saw yellow crime scene tape around the victims' house.

Mr. Duhon was interviewed by Detective Paul Trouard later that day. Mr. Duhon recalled telling the detective that the front door to the victims' house was open and the light was on. Mr. Duhon was shown a picture of Defendant's truck. He stated that the picture resembled the truck he saw and described the color as "green, greenish-blue teal." Mr. Duhon agreed that he told the detective the man from the truck was wearing denim shorts and a black t-shirt with the sleeves cut out. At trial, Mr. Duhon stated he had seen the truck at the victims' house on other occasions, but he did not know Defendant.

Mr. Duhon testified that the detective showed him a photographic lineup and he picked out a person. "And then maybe a day or so later when I saw the news, I was like that's not the person that I picked." However, he said that he did not look at the face of the man who got out of the truck that morning. He also testified later that he was not able to pick someone out of the photographic lineup as the man he saw the morning of the 27th. "The one who got out of the vehicle, in my head, was just a person getting out of the vehicle. And from what I saw on TV, he was

not recognizable to me." He had described the man as being in his early sixties, skinny, and white.

Dwayne Angelle, a detective with the Lafayette Parish Sheriff's Office, arrived on the scene at approximately 9:30 a.m. The detective observed that the frying pan Mr. Brown was cooking chicken in was still warm to the touch and the chicken had not completely cooked. He noted that the back door was held shut from the inside with a nail. The detective further noted there were tire tracks in the front yard in the mud. The detective described how he made a cast of the tire tracks and impression of Defendant's truck tires. Testimony later established that the tire tracks in the mud in front of the victims' house were the same brand and type of tires that were on Defendant's truck.

Detective Paul Trouard was a crime scene investigator for the Lafayette City Police Department. He testified he arrived at the crime scene approximately 8:45 a.m. There were two officers already on the scene when he arrived. He stated he saw keys in the front door lock when he arrived. He talked with Mr. Prejean and learned the name of some people who may have been around the victims' house recently. He also sent officers off to canvas the neighborhood. The detective explained they were quickly able to verify that the ex-boyfriend was in Alabama on a job site and had been since Monday of that week. He further testified that officers were sent out to Defendant's residence. Defendant was not there, so an officer was positioned to wait to see if he returned.

Meanwhile, the detective testified he perused the crime scene. He noted that Mr. Brown appeared to have been standing at the stove at the time he was shot once in the forehead. He noted that the chicken Mr. Brown was frying was still a little pink and the frying pan was warm. There was no bullet casing found around the body or in the kitchen. Ms. Carter was also shot once in the forehead and there

8

was no casing located around her body or in the bedroom. Her phone was missing. The detective stated that the phone company was called in an attempt to locate the phone, but the phone had been shut off.

Detective Trouard testified that he was notified that at approximately 10:30 a.m., Defendant returned to his house and was detained. At this time, Detective Trouard stated that with the information they had received from Mr. Duhon, they were able to get a search warrant and subsequently searched Defendant's house and truck. In the attic, in an LSU bag, tucked inside a duffle bag, a Ruger, GP-100, .357 revolver was located, along with two wallets belonging to Mr. Brown, a remote control for a TV, and Ms. Carter's phone. There were four live cartridges and two spent cartridges in the revolver's cylinder.

The detective testified that also in the bag with the revolver was an unmarked pill bottle containing Xanax, certain paraphernalia associated with crack cocaine use, and a receipt from Travel Host Motel in Lafayette for the dates of July 22 to 25, 2011, under Ms. Carter's name. Denim shorts and a black t-shirt with cut-out sleeves were found on the floor of Defendant's bedroom. Both items were damp, as if they had been in the rain or were sweaty. The detective testified that the next day he took the TV remote back to the victims' house, and the remote turned on Ms. Carter's TV in her bedroom. Detective Trouard said that he sent the bullets and bullet fragments taken from the victims' heads to the crime laboratory for testing. Later during trial, it was established that the bullets removed from the victims' skulls were fired from the .357 revolver found in Defendant's attic.

During cross-examination, Detective Trouard stated that Ms. Carter was a known prostitute. He further stated that he knew of no blood evidence located on Defendant's person, in his truck, or on the denim shorts or t-shirt found in his residence. Finally, he testified that Mr. Duhon was shown a photographic lineup,

which included Defendant's picture, but Mr. Duhon was unable to pick anyone out of the group of six pictures as the man he saw the morning the victims were shot.

David Kreig, a neighbor of Defendant's, testified that on the morning of the 27th, sometime between 7:00 and 7:30, he was working outside on his house when he saw Defendant drive up to his residence, jump out of his truck, and run into his house. A few minutes later, Defendant came out of the house and drove away.

Kathy Rieners, Defendant's ex-wife, Jimmy Hargrave, a long-time friend, and Elizabeth Thibodeaux, Defendant's daughter, testified that they had never witnessed Defendant exhibit violence towards anyone. They testified that Defendant's reputation in the community was one of being a friendly, generous, peaceful, and loving person, who loved his dogs and loved to cook for his friends.

Defendant testified that he was fifty-three years old at the time of trial. He grew up in Kaplan, Louisiana. After graduation from high school, he went into the Navy for three years. He stated that in 1982, when he was twenty-one years old, he was convicted of possession of cocaine and served one year incarceration. He testified he met Ms. Carter in 2006, and through her, Mr. Brown. He stated he and Ms. Carter became friends and partied often together. He said he liked Mr. Brown and had a good relationship with him. He said that Ms. Carter would often use his truck for errands and to purchase drugs for the both of them.

Defendant testified that on the Friday before the shooting, he called Ms. Carter at midnight and asked her if she could front him some crack cocaine. He told her he had just deposited a check but it would not clear until Saturday morning. She invited him over. Because she wanted some collateral to front the drugs, he packed up his gun in a tool bag and took it to her house. Saturday morning he got the money out of the bank and bought more drugs and they partied through the weekend to Tuesday night, consuming alcohol and smoking the crack

cocaine. He stated that they ran out of drugs and money by Tuesday night. Defendant said he was coming down off the high and wanted to go home to sleep. He stated he left the victims' house around midnight. The gun was left at Ms. Carter's because she did not want him to take the gun. He said the next morning he was going to get a pay-day loan for more drugs. Ms. Carter started calling him early in the morning, urging him to get the money, but the pay-day loan offices did not open until 9:00 a.m.

He said he got to the victims' house "close to 7:00." He stated the front and back doors were "wide open." He saw Mr. Brown and at first, thought he fell down. He said he did not check to see if Mr. Brown was alive. He went to Ms. Carter's room and saw that she had been shot. He said that he lost his mind and panicked. The gun was laying on the bed, along with a wallet. He testified he grabbed an LSU bag on the bed and put the gun, some prescription drugs, and the wallet in the bag. He said he did not know if there was someone out there that was going to come back and possibly shoot him. He picked up everything that could conceivably connect him with the shooting, especially after he saw that the gun had been fired twice. He thought the remote to the TV was in the LSU bag. Defendant testified it took about twenty-five minutes to drive between the victims' house and his house, so he thought he got back to his house around 7:30 a.m. Defendant denied that he shot and killed Mr. Brown and Ms. Carter.

On cross-examination, Defendant testified that he and Ms. Carter were going to sell the gun. She told him that she had someone interested in buying it. He said he had taken the gun into the house inside a tool bag with his tools because Mr. Brown did not allow guns in the house, and Defendant did not want the gun and tools left in the truck because of the neighborhood. Defendant agreed that he had told the police that Ms. Carter had put the gun in a drawer after he had first arrived

11

on Saturday morning. Defendant also agreed that he had told the police that he and Ms. Carter were bickering over selling the gun. He stated that when Ms. Carter called him on the morning of the 27th, she told him that she had shown the gun to someone who told her that Defendant was trying to set them up and that he needed to get the gun "right now." He admitted that he acted like he did not know the couple had been shot after he was told why he was being arrested. He also admitted that at the time he was in financial distress and that he was behind on his mortgage payments.

John Gabriel, a private investigator, testified that the week of trial, he drove from where the victims' house was located to where Defendant's house was located in twenty-two minutes at six o'clock in the morning.

Defendant first argues: **"The Only Evidence of Identification of the Shooter Actually Exonerated Eric Abshire."** He argues that the eyewitness, who saw a man arrive at the victims' house around 7:00 a.m., could not identify him as the man exiting the truck and entering the victims' house. He argues that Mr. Duhon repeatedly testified that Defendant was not the man he saw.

At trial, when the prosecutor asked if he saw the man's face, Mr. Duhon testified:

A. Not like I can see your face. I saw, you know, a face.

Q. Well, right. I mean, the person who got out of the vehicle had a face and you saw it?

A. Right.

Q. I mean, I didn't mean it to be a trick question.

A. No, no, I know.

Q. Could you see it well enough to make an identification from what you saw that morning?

A. No. What I have more memory of is what I heard and that was the pops, the cough, and the engine shut off. As far as the face, the first time I saw his face was on TV, actually, because I had never really associated - - you know, we have different lives and I work and they do other things. So that - - I mean, I wouldn't have - - He wasn't a recognizable person to me, so I wouldn't have really - -

Q. Are you saying he's not a recognizable person, or are you saying the person who got out of the vehicle is not a recognizable person, or are you saying the same?

A. The one who got out of the vehicle, in my head, was just a person getting out of the vehicle. And from what I saw on TV, he was not recognizable to me.

As noted above, while initially Mr. Duhon testified he picked someone out of a six-pack of photographs given to him, which included a picture of Defendant, and it was not the person he saw on TV who had been arrested for the murders, he later testified:

Q. He [Detective Trouard] showed you a photograph. He showed you a photograph of Eric Abshire, and you told him that I cannot identify that as the person that was there that morning when I heard the two (2) pops, right?

A. He didn't show me a picture of Eric Abshire. He showed me - - I think it was eight (8) pictures - -

Q. All right.

A. And I was - - I was made to pick one.

Q. I'm sorry. I phrased that wrong. He showed you a group of pictures?

A. Right.

Q. And out of those - - I think it was six (6). If you say eight (8), that's fine. Out of those pictures that you saw, you did not identify anybody in that group as the person that you saw that morning in the green truck when you heard the two (2) pops?

A. That's correct.

Finally, Defendant argues that after being shown a picture of Defendant a week prior to trial by the private investigator, Mr. Gabriel, Mr. Duhon wrote a

statement which "admitted that Mr. Abshire did not look at all like the person that got out of the truck that morning. However, what Mr. Duhon wrote in the statement, dated March 19, 2015, was "[f]rom what I recall, being about 120 yards away, the man in this picture did not look like the man that I saw get out of the truck."

Mr. Duhon's inability to identify Defendant as the man who got out of the truck does not exonerate Defendant in this case. While Mr. Duhon described the man as a skinny, fifty to sixty year old white man and it was indicated at trial that Defendant was on the stocky side, we note that it was around 6:00 a.m., on an apparently rainy morning, Mr. Duhon viewed the man very briefly from more than three hundred and sixty feet away—more than the length of a football field. Mr. Duhon stated repeatedly that he did not see the man's face sufficiently in order to recognize him. However, he did describe a man in denim shorts and a black t-shirt with cut out sleeves, and the officers located damp denim shorts and a damp black t-shirt with cut out sleeves on the floor of Defendant's bedroom.

Mr. Duhon also identified Defendant's truck as being very similar to the truck he saw at the victims' house that morning. Defendant points out, however, that Mr. Duhon described the truck as being a "green, greenish-blue teal," while Mr. Kreig, Defendant's next door neighbor, described Defendant's truck as being "a darkish blue-ish color, kind of dark." Defendant asserts that these different descriptions rendered the State's reliance on Mr. Duhon's testimony that the truck he saw at the victims' house that morning looked like Defendant's truck "questionable at best."

All these facts testified to by Mr. Duhon were collateral facts that may or may not infer the main facts, using reason and common experience. As noted by the State, "[w]hen determining whether sufficient evidence was presented at trial[,

14

the] evidence should be analyzed as a whole." When analyzing circumstantial evidence, La.R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *State v. McLean*, 525 So.2d 1251, 1255 (La.App. 1 Cir.), *writ denied*, 532 So.2d 130 (La.1988).

Defendant further argues: "The State Failed to Negate the Reasonable Probability that Eric Abshire Did Not Shoot the Victims, But Rather Innocently Arrived at their House After their Murder and Left in a Panic." Defendant first asserts that the timeline of events show that he could not have been at the victims' house when the shootings allegedly took place. He argues that he arrived at the victims' house around 7:00 a.m. Mr. Duhon was the only witness who could establish the time with some certainty based on the fact that he got coffee at Starbuck's when it opened at 5:30 in the morning and that it took him fifteen to twenty minutes to get home. He stated he handed his wife her coffee and walked directly out to the back yard. Accordingly, Mr. Duhon testified the truck arrived at the victims' house around 6:00 a.m. As soon as the truck parked in front of the house, the suspect left the truck and entered the house. Mr. Duhon said he heard sounds that could have been two shots. He did not see the suspect leave. He waited a few minutes and then went back inside his house. Mr. Kreig, Defendant's neighbor, testified he saw Defendant drive up to Defendant's house on the morning of the shooting sometime between 7:00 and 7:30.

In brief (citations omitted), Defendant argues:

> Despite the State's effort to impeach Mr. Abshire's story and his timeline of events, Mr. Duhon's timeline of the events starting at 6:00 a.m. supports Mr. Abshire's story. When questioning Mr. Abshire on cross examination, and when arguing to the jury at closing the timeline of events, the State said David Kreig, Mr. Abshire's neighbor, testified that Mr. Abshire returned home at 7:00 a.m. –when in fact Mr. Kreig expressly allowed for a thirty-minute window in his

15

timeline. This is crucially important, because Mr. Abshire was fairly confident in his assertion that he arrived at the victim's home at around 7:00 a.m., left shortly thereafter in a panic, and drove the twenty to twenty-five minutes back to his house in Youngsville. The State tried to imply that Mr. Kreig's testimony contradicted Mr. Abshire's allegation that he was at the victims' house around 7:00 a.m. In fact, Mr. Kreig's testimony shows he was not certain about the time he saw Mr. Abshire and gave a 30-minute time frame to be safe (7:00 – 7:30.); unlike Mr. Duhon who was fairly certain he witnessed the events of this case at or near 6:00 a.m.

In brief, the State points out that Defendant's version of the timeline was based on his self-serving testimony that he arrived at the victims' house "close" to 7:00 a.m. The State further points out that Defendant "left no room for estimations of times as opposed to exact times." Furthermore, we note that Defendant does not consider in his argument that Mr. Prejean also testified that he arrived at the victims' residence around 7:00 a.m. Thus, the jury could have reasonably concluded Defendant arrived at the victims' residence earlier than he testified since Mr. Prejean obviously arrived at the victims' house after Defendant left.

In brief, Defendant further argues:

The evidence offered included Mr. Abshire's[] prior history with the victims, a vehicle that may have resembled a vehicle seen at the scene of the murder, behavior when confronted by police at his house, common clothing found at his house that generally matched a description of the shooter, and money troubles he allegedly had as a result of his drug addiction. Other circumstantial evidence, including the presence of the gun and other items taken from the victims' home that were found in the attic of his house after the shooting were ambiguous at best. The use of these facts by the State was speculative.

Defendant asserts all of these actions relied on by the State to prove their case can be explained by Defendant's drug-addled reaction to finding the victims shot. He testified that when he saw Ms. Carter dead on her bed he was still high on crack cocaine and panicked, especially after he found the gun lying on the bed and saw that two of the cartridges had been fired. He said he grabbed everything he

16

thought that could connect him to the shooting and put the stuff into Ms. Carter's LSU bag that was also on the bed. He testified:

> A. I really panicked. I was high, you know. I mean, I had come down quite a bit, but after that many days of being up that long, your logistics and your logic sequences just doesn't work. And I couldn't - - I tried to think what was happening and come up with a solution, and I couldn't, and I had to get out of there to think.
>
> Q. Were you scared?
>
> A. Yes. Yes, I was. With both doors open, I didn't know if somebody was coming back or what.

He further testified he put the bag with the gun in it in the attic because he did not want to be caught with it in his truck.

This court finds that Defendant's behavior he claims was a drug-addled reaction, also exhibits a guilty mind. Evidence of flight, concealment, and lying reasonably raises an inference of a "guilty mind." Defendant also admitted at trial that he initially acted like he did not know anything about the shooting when he was first confronted by the police. *See State v. Arvie*, 11-123 (La. App. 3 Cir. 10/5/11), 73 So.3d 516, *writ denied*, 11-2493 (La. 3/20/12), 85 So.3d 114, and *State v. Wiley*, 03-884 (La.App. 5 Cir. 4/27/04), 880 So.2d 854, *writ denied*, 04-1298 (La. 10/29/04), 885 So.2d 585.

While Mr. Prejean testified that the house was locked up and he had to use a key to enter, Defendant testified both the front and the back doors were wide open. Mr. Duhon had also stated at trial that the victims' front door was open when the man in the truck arrived. Although Defendant testified he was panicked, his thought process was coherent enough to realize his fingerprints were present in the bedroom, on the TV remote, and on the gun. Additionally, he apparently took the time to latch the back door and lock the front door behind him when he left the house.

17

The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983).

We agree with Defendant that the verdict was founded primarily on circumstantial evidence. However, that evidence was sufficiently compelling as to support the verdict beyond a reasonable doubt. Testimony established that Defendant was the last to see the victims alive and the first to see them dead. Defendant admitted that he and Ms. Carter had been on a four-day drug binge and were desperate to get more drugs. Defendant's gun was the weapon that killed the victims, and he admitted he had taken the gun to the victims' house. At the apparent time the victims were shot, a truck similar to Defendant's was seen at the house, and the man entering the house was described as wearing clothes like clothes later found in Defendant's house. Defendant admitted he attempted to hide evidence; he took the gun, Mr. Brown's wallets, Ms. Carter's cell phone, and the TV remote and hid them in his attic, and he lied to the police when he was told about the victims being shot.

The jury heard all the testimony, including the inconsistencies regarding the timeline, Mr. Duhon's inability to recognize the man who entered the house, and

Defendant's truck. They also heard Defendant's testimony. On appeal, this court will not assess the credibility of the witnesses or reweigh the evidence to overturn the jury's determination of guilty. *State v. Glynn* 94-332 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, *writ denied*, 95-1153 (La. 10/6/95), 661 So.2d 464. Considering the totality of the evidence and the circumstances in a light most favorable to the State, this court finds that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that Defendant shot and killed the victims.

There is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER 2:

Defendant argues that the trial court erred when it would not permit him to introduce cellphone records obtained by the State that he alleged were exculpatory. We disagree.

In March 2013, the State subpoenaed Defendant's phone records from Defendant's cell provider, AT&T, for the day of July 27, 2011. The police then contacted the Regional Organized Crime Information Center (ROCIC) in Tennessee and requested the center to create cell tower "hit" maps from Defendant's cell phone records. These records were supplied to Defendant through discovery. However, a few days prior to trial, the prosecutor informed Defendant that she would not be admitting the records because she was unable to secure an expert from ROCIC to testify regarding the cell tower maps.

At trial, Defendant argued that he should be allowed to present the maps, which he claimed exonerated him, without the necessary requirement of authentication of the documents for the reason that the State had subpoenaed the documents. In brief, Defendant asserts:

"[t]he documents were created by the State and revealed that the AT&T metadata showed that Mr. Abshire's cellphone pinged a cell tower near his home in Youngsville, Louisiana at 5:54 – 5:55 a.m. on the morning of July 27, 2011 – at nearly the exact time and date that the State claims Mr. Brown and Ms. Carter were being murdered halfway across Lafayette Parish."

The State argued, however, that since the documents could not be authenticated by an agent of ROCIC, the maps were not reliable. Louisiana Code of Evidence Article 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Following argument, the trial court sustained the State's objection to the admission of the cell phone records, including the tower "hit" maps. Nonetheless, the trial court allowed Defendant to question Detective Tourand regarding the purported data. Detective testified he could not accurately interpret the maps:

Q. I'm not asking you whether or not it's accurate.

A. Yes, sir.

Q. What I'm asking you: Is there anything written on the documents that you reviewed, whatever the time zone, that indicated Mr. Abshire's cell phone was in Youngsville, Louisiana at 5:55 a.m.?

A. If you want me to interpret someone else's data, I'll be happy to read to you what's on the paper, if that's what you're asking me.

Q. What time does that say?

A. That says 5:54 to 5:55 a.m.

Q. Where is it located?

A. That tower right there is in Youngsville.

Q. Youngsville, Louisiana, just to be clear, on July 27, right?

A. That's what's written at the top of the paper.

Q. And this information is about Eric Abshire's phone?

20

A. Correct.

Q. This information indicates that Eric Abshire's phone on July 27th, 2011 at 5:55 a.m. was in Youngsville, Louisiana, correct?

A. Not specifically at all.

Q. In the area of Youngsville?

A. The times could be completely off. Once again, the time could be East Coast, West Coast, Central or Pacific. You'd have to get the person that made the times and put them on that paper. You're asking me to tell you that his cell phone was in that area, and that is - - I would absolutely be lying. I cannot interpret the data on that sheet of paper. I would be better doing heart surgery than interpreting that data.

The detective went on to point out that according to the cell tower "hit" map, the phone was receiving and or sending calls and text messages even after he had taken the phone into his custody. "Once again, that phone was in myself [sic] custody at 11:00 a.m., and I did not send a text message. That's what I'm saying about the times."

In brief, the State notes:

The defense argued that the maps were "identified" by Det. Trouard as documents from ROCIC and created at the request of the state. However, this "identification" did not and could not provide trustworthiness or reliability to these documents, as Det. Trouard was not an expert in cell phone mapping or cell site analysis. He testified he did not understand all of the working of the maps or how to interpret the data included on the map, even down to the time zones.

We note that the State did not argue that "the document itself was unreliable. Its reliability rests in the knowledge and experience of the proper expert witness who could testify to the map's data and information." In cases where cell tower mapping was used to establish the location of an accused, an expert in historical cell site analysis was required to interpret and explain the information given by the maps to the jury. *See State v. Saltzman*, 13-276 (La.App. 3 Cir. 10/23/13), 128 So.3d 1060, *writ denied,* 14-11 (La. 6/13/14), 140 So.3d 1187, *cert denied*, ___

21

U.S. ___, 135 S.Ct. 678 (2014), and *State v. Marinello*, 09-1260 (La. App. 3 Cir. 10/6/10), 49 So.3d 488, *writ denied*, 10-2534 (La. 3/25/11), 61 So.3d 661 *and writ denied*, 10-2494 (La. 3/25 11), 61 So.3d 660.

Even though the trial court did not allow the documents into evidence, the trial court allowed testimony regarding the data provided on the maps. Following trial, the phone records and maps were proffered. Accordingly, the jury still heard the testimony Defendant was attempting to admit through the maps and any error by the trial court by not allowing the document's admission was harmless.

There is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER 3:

Defendant was convicted of two counts of first degree murder by a ten to two vote for guilty as charged. Defendant objected to the verdict as being less than a unanimous verdict, thus violating Defendant's constitutional right to due process.

In brief (record citations omitted), Defendant argued:

> Two jurors, Anna Chapman and Victoria Mattingly, cast not guilty verdicts in this case. Both of these jurors were accepted by the State as "reasonable jurors." The burden of proof upon the State in this case was to prove the existences of every element of the crime, including the identity of the shooter, *beyond* a reasonable doubt. *In re Winship*, 397 U.S. 358. "[P]roof beyond a reasonable doubt is among the 'essentials of due process and fair treatment.[']" *Id.* at 359. When two "reasonable" jurors have doubt as to the [sic] whether the State met their burden by returning not guilty verdicts, it is *per se* evidence that the State did not prove their case beyond a reasonable doubt. As such, Mr. Abshire's due process rights, as applied in this case, were violated because the State was not held to its burden of proof.

However, the Louisiana Supreme Court has repeatedly held non-unanimous verdicts to be constitutional. *See State v. Bertrand,* 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738; *State v. Jones,* 381 So.2d 416 (La.1980); *State v. Simmons,* 414 So.2d 705 (La.1982); and *State v. Edwards,* 420 So.2d 663 (La.1982). In *State v. Hardy*, 11-267, pp. 6-8 (La.App. 3 Cir. 10/5/11), 72 So.3d 1017, 1021-22, *writ*

*denied*, 11-2386 (La. 3/9/12), 85 So.3d 690, this court discussed a non-unanimous verdict in the case of a second degree murder conviction:

> Defendant states in brief that after the verdict of second degree murder was pronounced by a ten to two vote, she "objected to the non-unanimous verdict. The Court noted the Defense objection but permitted the verdict to stand." Defendant argued that La.Code Crim.P. art. 782, which allows for non-unanimous verdicts when the punishment involves incarceration at hard labor (but not for capital offenses), was unconstitutional. According to Defendant, the trial court erred when it denied her objection to the non-unanimous decision.

> In brief, Defendant argues that this court should ignore the plurality ruling of *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and hold that a ten to two verdict fails to satisfy due process of law. In *Apodaca*, the United States Supreme Court upheld non-unanimous verdicts in state felony cases. The Supreme Court concluded that the Sixth Amendment's jury trial guarantee did not require unanimous verdicts. The holding of *Apodaca* was discussed with approval by the Louisiana Supreme Court in *State v. Bertrand,* 08-2215, (La.3/17/09), 6 So.3d 738, while reviewing a Louisiana judicial district court's declaration that Article 782 was unconstitutional for the reason that it permitted non-unanimous verdicts. The Louisiana Supreme Court stated:

> > In *Apodaca*, the United States Supreme Court examined an Oregon statute similar to Article 782, in that the Oregon statute did not require unanimous jury verdicts in noncapital cases. In a plurality decision, the Court determined that the United States Constitution did not mandate unanimous jury verdicts in state court felony criminal trials, with four Justices holding that the Sixth Amendment guarantee of a jury trial, made applicable to the States by the Fourteenth Amendment, does not require that a jury's vote be unanimous. Justice Powell concurred in the judgment of the Court for reasons different than those expressed by the author of the opinion. Four Justices, disagreed, finding that the Sixth Amendment guarantee of a jury trial was made applicable to the States by the Fourteenth Amendment, and does require a unanimous jury.

> > . . . .

> > This Court has previously discussed and affirmed the constitutionality of Article 782 on at least three occasions. In *State v. Jones,* 381 So.2d 416 (La.1980), we ruled that Article 782 did not violate the Sixth and Fourteenth Amendments. Later, in *State v. Simmons*, 414

23

So.2d 705 (La.1982), we found that Article 782 did not violate either the Fifth or Fourteenth Amendments. Finally, in *State v. Edwards*, 420 So.2d 663 (La.1982), we again affirmed the statute's constitutionality.

Despite defendants' arguments to the contrary, the case law of the United States Supreme Court also supports the validity of these decisions. Although the *Apodaca* decision was, indeed, a plurality decision rather than a majority one, the Court has cited or discussed the opinion not less than sixteen times since its issuance. On each of these occasions, it is apparent that the Court considered that *Apodaca's* holding as to non-unanimous jury verdicts represents well-settled law

Defendant has presented no original argument as to why this court should find the statute unconstitutional other than "[a]ppellant simply makes this argument because it is a matter of federal constitutional law, as opposed to state law, and thus the Louisiana Supreme Court is not the final arbiter of this issue."

Accordingly, there is no merit to this assignment of error.

## ASSIGNMENT OF ERROR NUMBER 4:

For his final assignment of error, Defendant argues trial counsel's performance was ineffective. Following pronouncement of the verdict, trial counsel made an oral motion for a new trial based on the allegation the State withheld potentially exculpatory information. The trial court denied the motion. Trial counsel then waived all delays, and the trial court proceeded to sentence Defendant.

Defendant argues that because trial counsel waived the time delays, he did not have a chance to investigate the issue of whether the State withheld exculpatory evidence prior to being sentenced; therefore, "the trial court lost jurisdiction in the case and could not revisit the Brady issue and whether a new trial was warranted."

With regard to ineffective assistance of counsel, in *State v. Kinsey*, 42,935, pp. 9-10 (La.App. 2 Cir. 2/13/08), 976 So.2d 315, 320, the second circuit stated the following:

> The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. *State v. Wry*, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Moore*, 575 So.2d 928 (La.App. 2d Cir.1991).

> Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires defendant to establish that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland, supra*.

As discussed above, Mr. Duhon had mentioned during trial he picked out a possible suspect from a photographic lineup. However, later during his testimony he stated that while he viewed a photographic lineup provided to him by Detective Trouard, he did not recognize any of the men in the lineup as being the man he saw exit the truck and enter the victims' house just prior to shots being fired. Detective Trouard also testified that he provided Mr. Duhon with a photographic lineup and that Mr. Duhon did not pick out any of the men pictured as the suspect.

After the jury was relieved, trial counsel stated:

MR. ALONZO: Your Honor, I just want to put on the record -- I want to address a motion for a new trial within the time deadlines, and I just want to make sure the Court understands why.

During the testimony of Chad Duhon -- And I'll have to get the minutes and I'm going to request those, Judge, but it appeared that he

25

said that he chose someone else in the lineup. Now, I may be wrong; I'm not sure, but just for the record I have received no lineup indicating he chose someone else out of the lineup that was shown to him by Detective Trouard. If that does exist, that would be Brady Material, and we would file a motion for a new trial.

I would ask on the record for a copy of Chad Duhon's trial testimony transcript so we can examine that possibility.

THE COURT: Any response?

MS. SIMON: I have not been made aware of any identification made by Chad Duhon. If I had been made aware of it, I would have provided it to Mr. Alonzo.

THE COURT: Okay. I believe - - Well, the sentence is mandatory, but it's also mandatory that he has three (3) days or something like that, and he wants to have that, correct?

MR. ALONZO: Yes, Your Honor.

THE COURT: Okay. So let's have a sidebar.

(BENCH CONFERENCE)

MR. ALONZO: Your Honor, in light of all that, I've talked to my client, Mr. Abshire, and we'll just waive the delays with the understanding that he's not giving up any other rights. I've explained that to him, other than waiting three (3) days. He's okay with proceeding now. I've described that to him in detail, his rights, and he's agreed.

While the witness did testify at trial that he identified a suspect from a photographic lineup, he later testified otherwise, and Detective Trouard, who prepared the photographic lineup and presented it to Mr. Duhon, also testified Mr. Duhon did not identify anyone from the lineup as the suspected assailant. The State asserted that it did not have knowledge of a photographic lineup wherein Mr. Duhon identified anyone as the man who got out of the truck the morning the victims were killed. Furthermore, there was no photographic lineup in the record before this court.

Considering that the witness did make the statement that the man he saw on the television was not the man he picked out of the photographic lineup and later

26

stated that he was made to pick someone out of the photographic lineup, the question of whether defense counsel's performance was ineffective when he allowed Defendant to waive the time delays should be relegated to post-conviction relief. The record before this court is insufficient to resolve the issue of ineffective assistance. Generally an ineffective assistance of counsel claim is most appropriately addressed through an application for post-conviction relief filed in the district court, where a full evidentiary hearing can be conducted, rather than by direct appeal. *State in the interest of A. B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012.

## **DECREE:**

This court affirms Defendant's convictions and sentences. Defendant's claim that trial counsel was ineffective for waiving the sentencing delays is relegated to post-conviction proceedings. The trial court is ordered to amend the minute entry of sentencing to correctly reflect the sentences imposed.

**CONVICTIONS AND SENTENCES AFFIRMED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules– Courts of Appeal, Rule 2–16.3.